James NORMAN and Paulette Patterson, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Gordon JOHNSON, Director, Illinois Department of Children and Family Services, Defendant.

No. 89 C 1624.

United States District Court, N.D. Illinois, E.D.

May 18, 1990.

Diane Redleaf, Joan Matlack, Susan Wishnick, Laurene M. Heybach, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

Bart T. Murphy, Office of the Atty. Gen., Susan Getzendanner, Christina M. Tchen, Charles F. Smith, Kimberley K. Baer, Skadden Arps Slate Meagher & Flom, Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

HART, District Judge.

This is a putative class action challenging certain practices of the Illinois Department of Children and Family Services ("DCFS") as being in violation of relevant federal statutes and the federal Constitution. Plaintiffs' motion for class certification and for preliminary relief for the named class members was referred to a magistrate for a report and recommendation. After a hearing, the magistrate issued recommended findings of fact and conclusions of law. The magistrate recommended granting a preliminary injunction as to plaintiffs Wanda Hilliard and Joann Mitchell and denying preliminary relief to plaintiff Gina Johnson.[1] Defendant objected to the recommendation as regards Hilliard and Mitchell.[2] No objection was raised to the recommended denial of relief for Johnson.

As stated in the First Amended Complaint, plaintiffs "are impoverished parents and legal guardians who have lost, are at risk of losing, will lose, or cannot regain custody of their children from the Illinois Department of Children and Family Services ('DCFS') because they are homeless or unable to provide food or shelter for their children." Defendant Gordon Johnson is the director of DCFS, an agency of the State of Illinois. According to the complaint,

> Plaintiffs challenge defendant's policies and practices of (1) taking and retaining custody of children from impoverished parents and legal guardians because of their inability to obtain cash, food, shelter, or other subsistence, while failing to assist the parents and children to meet these needs; (2) failing to assist them to secure cash, food, shelter or other subsistence through the coordination of services to needy families and otherwise; (3) failing to make reasonable efforts to prevent removal of plaintiffs' children and reunite families; and (4) abridging the liberty and property interests of parents in retaining custody of their children and maintaining the means to support themselves and their families. Plaintiffs allege that these policies and practices violate provisions of Title IV–B and IV–E of the Social Security Act, as amended by the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620 *et seq.* and 671 *et seq.*, and the First and Fourteenth Amendments to the United States Constitution.

Plaintiffs seek only injunctive and declaratory relief; no damages are sought.

Stated succinctly, the magistrate found that plaintiffs Hilliard, Mitchell, and Johnson were separated from their children and could not be reunited with them, at least in

---

**1.** The recommendation as to class certification has not yet been issued.

**2.** Leave was reluctantly granted to defendant to file a 50–page brief in support of his objections to the magistrate's report. It is now apparent that such a lengthy brief was burdensome. It is filled with repetitive arguments. *See Fleming v. County of Kane*, 855 F.2d 496, 497 (7th Cir.1988) (per curiam). Also, defendant (and, to a lesser

degree, plaintiffs) seek to incorporate arguments contained in the briefs before the magistrate into the already oversized briefs. *Cf. id.* at 498. Surprisingly, despite the length of the briefs, both parties make a number of assertions regarding legal rules without citing authority to support their assertions, thereby further imposing an undue burden on the court.

part, because of their inability to provide adequate housing for the children. The magistrate found that, in violation of 42 U.S.C. § 671(a)(15),[3] DCFS typically does not make a reasonable effort to assist such parents in finding and obtaining housing so that they can be reunited with their children. However, with respect to Johnson, the magistrate found a reasonable effort had been made and therefore recommended not granting any relief for Johnson. A preliminary injunction in favor of Hilliard and Mitchell was recommended. Defendant challenges some of the factual findings supporting this recommendation. His primary arguments, however, are that there is no legal basis for granting the relief recommended either because there is no private right of action or because abstention militates against granting such relief.

## FINDINGS OF FACT

Defendant's objections to the magistrate's findings of fact have been examined, as have the transcribed testimony and plaintiffs' response to the objections. No material fact contained in the proposed findings requires revision. The magistrate's recommended findings of fact are adopted.[4]

3. Section 671(a)(15), which is part of the Adoption Assistance and Child Welfare Act of 1980 ("AAA") and included in Title IV–E of the Social Security Act, provides:

> (a) In order for a state to be eligible for payments under this part, it shall have a plan approved by the Secretary which— ...
> (15) effective October 1, 1983, provides that, in each case, reasonable efforts will be made (A) prior to placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home.

4. The recommended findings of fact consist of 72 paragraphs and are on pages 1192 through 1202 of the magistrate's report. The magistrate's report is attached hereto as an appendix.

5. Any finding of fact which is a conclusion of law shall be deemed to be a conclusion of law as if fully set forth therein. Any conclusion of law that is a finding of fact shall be deemed to be a finding of fact as if fully set forth therein.

## CONCLUSIONS OF LAW[5]

■ A number of federal courts, including at least two circuit courts,[6] have held that rights provided for in the AAA are enforceable either under § 1983, *L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir.1988), cert. denied, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989); *Lynch v. Dukakis*, 719 F.2d 504, 509–12 (1st Cir.1983); *Artist M. v. Johnson*, 726 F.Supp. 690, 696–97 (N.D.Ill.1989); *Aristotle P. v. Johnson*, 721 F.Supp. 1002, 1011 (N.D.Ill.1989); *B.H. v. Johnson*, 715 F.Supp. 1387, 1403–04 (N.D. Ill.1989); *Joseph A. v. New Mexico Department of Human Services*, 575 F.Supp. 346, 353 (D.N.M.1983),[7] or because the AAA contains an implied right of private action. *Artist M.*, 726 F.Supp. at 694–96; *B.H.*, 715 F.Supp. at 1404–05. The statute can be enforced pursuant to § 1983;[8] it is unnecessary to determine if an implied right of action also exists.

There is a conflict as to whether § 671(a)(15)(B) creates an enforceable right to "reasonable efforts" to reunify the family. In *Artist M.*, Judge Shadur held that there is an enforceable right to prompt assignment of caseworkers. In determining whether such an enforceable right existed, Judge Shadur relied on the "reason-

6. Where the Seventh Circuit has not yet spoken on an issue, this court should give the consistent decisions of other circuits substantial deference. *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir.1987).

7. In *Scrivner v. Andrews*, 816 F.2d 261 (6th Cir.1987), the Sixth Circuit apparently agreed with *Lynch* that the rights under the AAA can be enforced pursuant to § 1983, but held that the AAA did not provide for a right to meaningful visitations. In *Del A. v. Edwards*, 855 F.2d 1148, vacated for reh'g, 862 F.2d 1107 (1988), appeal dismissed, 867 F.2d 842 (5th Cir.1989), a panel of the Fifth Circuit held, in an interlocutory appeal of a qualified immunity issue, that the AAA created rights enforceable under § 1983. That decision, however, was vacated for a rehearing en banc and the appeal was subsequently dismissed when plaintiffs voluntarily dismissed their damages claim.

8. The magistrate's well-reasoned and thorough discussion of whether the AAA may be enforced through § 1983 is also adopted. That discussion is at pages 1203 through 1208 of the magistrate's report.

able efforts" language of § 671(a)(15)(B). In *Aristotle P.*, Judge Williams held that "reasonable efforts to reunify families" was too amorphous to create an enforceable right. In *B.H.*, Judge Grady held there is no enforceable right to reasonable efforts to prevent removal and that, while there is a right to individualized case plans and a case review system, there is no right to be provided with particular services.[9] The state courts have generally found § 671(a)(15)(B)'s requirement of reasonable efforts to reunify the family to be enforceable in proceedings to terminate parental rights. *See In re Kenny F.*, 109 N.M. 472, 476, 786 P.2d 699, 703 (Ct.App.1990); *In re S.A.D.*, 382 Pa.Super. 166, 555 A.2d 123, 127–28 (1989); *In re M.H.*, 444 N.W.2d 110, 113 (Iowa Ct.App.1989); *In re Burns*, 519 A.2d 638, 648–49 (Del.1986). *But see In re Cynthia A.*, 8 Conn.App. 656, 514 A.2d 360, 365 (1986).[10] The state cases have held that the AAA requires the provision of affirmative services to help reunify the family, including, in appropriate circumstances, providing housing, monetary assistance for obtaining housing, and assistance in finding housing. It has also been held that the state child welfare agency may be required to provide services ordinarily provided by other agencies.[11] *S.A.D.*, 555 A.2d at 128.

Defendant argues that a standard of "reasonable efforts" is too vague to be enforceable. That argument is supported by *Aristotle P.*, 721 F.Supp. at 1012. It is contradicted by *Artist M.*, by the state cases that have found enforceable rights under § 671(a)(15) and applied the reasonable efforts language, and by the recommendation of the magistrate. *Aristotle P.*, as does defendant, relied on *Pennhurst*

*State School & Hospital v. Halderman*, 451 U.S. 1, 24–25, 101 S.Ct. 1531, 1543–1544, 67 L.Ed.2d 694 (1981). In *Pennhurst*, the Supreme Court stated it was difficult to know what was meant by "appropriate treatment" and "least restrictive" setting as used in 42 U.S.C. § 6010, the bill of rights provision of the Developmentally Disabled Assistance and Bill of Rights Act of 1975. This implied that § 6010 did not create enforceable rights because "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." The Supreme Court, however, made clear that while the nonspecificity of the language provided some support for interpreting Congress's intent, the "crucial inquiry ... is not whether a State would knowingly undertake that obligation, but whether Congress spoke so clearly that we can fairly say that the state could make an informed choice." 451 U.S. at 25, 101 S.Ct. at 1544.

The language of § 6010 stated, "Congress makes the following findings respecting the rights of person with developmental disabilities." The statute does not state that those findings create requirements for the states to follow. In contrast, § 671(a) expressly states that "in order for a State *to be eligible* for payments under this part, it *shall* have a plan ... which...." (Emphasis added.) Subsection (15) provides a specific date by which a participating state must comply with its requirements. The intent of Congress to mandate compliance with § 671(a)(15) is clearly expressed. Also, unlike the situation in *Pennhurst*, 451 U.S. at 25, 101 S.Ct. at 1544, the Secretary of Health and Human Services has

---

9. The other federal cases hold there is an enforceable right to case plans and case reviews, *see Massinga, supra; Lynch, supra; Joseph A., supra,* and maintenance of adequate foster home standards, *Massinga, supra.* Cases also hold there is no enforceable right to meaningful visitation, *Scrivner, supra,* nor to a least restrictive, most family-like placement, *Aristotle P., supra; B.H., supra.*

10. *Cynthia A.* holds rights under the AAA are unenforceable primarily because the AAA is an appropriations statute and therefore cannot cre-

ate enforceable rights. Such a holding has been rejected by the federal courts that have considered the enforceability of the AAA under § 1983.

11. Also, as *S.A.D.*, 555 A.2d at 128, points out, even viewed purely in fiscal terms, it is often cheaper to provide initial payments for rent, security deposits, utilities, and other items than to instead incur the much greater expense of placement outside the family.

included the "reasonable efforts" provisions among the requirements for a Title IV-E State plan and provides examples to further clarify the meaning of reasonable efforts. *See* 45 C.F.R. §§ 1356.21(b), 1356.21(d)(4), 1357.15(e). *See also S.A.D.*, 555 A.2d at 127–28.

Even absent consideration of the regulations, Judge Shadur is correct that a requirement of "reasonable efforts" is not too ambiguous to be enforceable. *See Artist M.*, 726 F.Supp. at 696–97. *Cf. Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 431–32, 107 S.Ct. 766, 775, 93 L.Ed.2d 781 (1987) (provision for a "reasonable" allowance for utilities not too vague or amorphous as to be unenforceable under § 1983). Courts are accustomed to enforcing reasonableness standards and state actors and others are accustomed to being required to comply with such standards. *See id.* at 432, 107 S.Ct. at 775. *See also Lynch*, 719 F.2d at 511–12 (difficulty in determining if state's actual practices are in compliance is no reason to deny enforcement). Also, the state cases cited above show that the states are able to interpret the reasonable efforts requirement. Contrary to defendant's argument, permitting enforcement does not unduly deprive the state of flexibility and discretion in providing child welfare services. A standard of "reasonable efforts" is a flexible standard that leaves much to the discretion of the states.

■ Defendant argues that even if rights under § 671(a)(15) can be enforced pursuant to § 1983, the child, not the parent, is the only appropriate party to seek enforcement of those rights. Defendants argue that a holding to the contrary would be "absolutely unprecedented" and that plaintiffs can cite no case to support their position. This is a surprising assertion for two reasons. First, defendant's brief contains no case citations in support of his own position. Just as there are no precedents expressly holding that parents can enforce rights under the AAA, there are no precedents holding parents cannot enforce such rights. Second, while no case has been found or cited which explicitly discusses

the question of parental standing to enforce rights under the AAA, a number of cases involve parents enforcing rights under the AAA. *Lynch* was a suit brought by both parents and children. *Scrivner* was brought by the mother of a child; relief was denied only because the particular right sought to be enforced was held not to be provided for by the AAA, not because a mother had no enforceable rights under the AAA. The state cases cited above are all suits in which the parents are permitted to enforce rights under the AAA. The magistrate's conclusion that parents can enforce rights under the AAA is far from "absolutely unprecedented."

The basis of defendant's argument is unclear. Defendant makes the same argument as regards both an implied private right of action and § 1983. But whether the AAA implies a cause of action for parents is a question distinct from whether a cause of action exists under § 1983. *See Artist M.*, 726 F.Supp. at 691–92. Since this court relies only on § 1983, it need only be considered whether parents can have a cause of action under that statute. As previously discussed, the rights contained in the AAA are enforceable under § 1983. Whether the parents are appropriate parties to enforce such rights would appear to be a standing question, an issue nowhere mentioned in defendant's brief, but one which must be addressed whenever a substantial question is raised because it goes to this court's jurisdiction. *Lindley v. Sullivan*, 889 F.2d 124, 128 n. 3 (7th Cir. 1989). The basic requirements of standing are that "A plaintiff must allege [1] personal injury[, 2] fairly traceable to the defendant's allegedly unlawful conduct and[, 3] likely to be redressed by the requested relief." *Frank Rosenberg, Inc. v. Tazewell County*, 882 F.2d 1165, 1168 (7th Cir. 1989), *cert. denied,* — U.S. —, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)) (brackets in *Rosenberg*). Those three requirements are clearly met by the parents.

■ There are, however, also prudential requirements of standing. Ordinarily, "as

a matter of prudence courts should not hear a plaintiff who rests his or her 'claim to relief on the legal rights or interests of third parties.'" *Lindley,* 889 F.2d at 128 (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). Perhaps this is the principle that defendant silently relies upon. Issues of prudential standing, however, are not jurisdictional and can be waived. *Lindley,* 889 F.2d at 129. While defendant argues the AAA creates rights only for children, not their parents, he cites no authority that that has any legal significance, i.e., he cites no standing cases. Therefore, the standing issue could be treated as waived, at least as regards the question of a preliminary injunction. The waiver issue need not be decided, however, because the AAA creates rights for parents as well as the children.[12] *See, e.g.,* 42 U.S.C. §§ 622(b); 625(a)(1)(D); 627(a)(1); 627(a)(2)(C); 671(a)(12); 675(5)(C); 675(6). Additionally, when a statute provides for the continued unification or reunification of a family, it cannot be said to be only for the benefit of the children, both the children and the parents are beneficiaries of such a policy. Furthermore, contrary to defendant's argument, some of the funding for states is used to provide services to parents as well as children. Plaintiffs in this case have standing.

■ Defendant also argues that the AAA only requires that an adequate system be in place and therefore only systemic deficiencies can violate the AAA. From this, defendant appears to draw the conclusion that only systemic relief can be granted and no claim for individual relief is available. It is unclear if defendant is making such an argument, but to the extent defendant is arguing this court can only examine the state's statutory and regulatory system to see if it complies with

the AAA, the argument is not supported by the cases. Even if, on paper, the state complies with the AAA, the AAA is still violated if the state's actual practices do not comply with the AAA. *Lynch,* 719 F.2d at 511. The magistrate found, with this court adopting those findings, that system-wide deficiencies exist. Therefore, it is unnecessary to determine if failure to make reasonable efforts as to only one person could state a claim under the AAA.[13] The question still remains as to whether individual relief can be granted based on systemic violations. Neither party cites any case authority on this question. However, there is no reason why an individual who suffers from systemic violations should not be entitled to relief under the statute. Moreover, since the court is presently only considering preliminary relief, it is more sensible to permit only individual relief instead of ordering broader systemic relief.

■ Defendant also argues that the magistrate's analysis essentially results in imposing a successful reunification standard instead of a reasonable efforts standard. It is true, as defendant points out, that the reasonable efforts standard can be satisfied without there being successful reunification.[14] Contrary to defendant's argument, Hilliard and Mitchell are not granted relief simply because they have not found adequate housing nor been reunited with their children, but because they have suffered from systemic deficiencies that included the failure of DCFS to make reasonable efforts on their behalf. That reasonable (or, at least, partially successful) efforts were put forth as regards Johnson is not incompatible with there being systemic deficiencies that generally result in inadequate efforts on behalf of persons in plaintiff's situations. Since efforts made to assist Johnson have aided her in her

---

12. Even if the AAA did not create rights for the parents, they might still have standing to bring this action. *Compare Lindley,* 889 F.2d at 129 (adopted child of recipient of disability benefits had third-party standing to maintain his parents' claim that denial of child insurance benefits was unconstitutional).

13. It is noted that, in the state cases previously referred to, individual parents were permitted

to claim violations of the AAA without proving systemic deficiencies.

14. This, of course, was also recognized by the magistrate. She did not recommend ordering reunification, but only recommended ordering the development "if, at all possible," of a plan to overcome obstacles to reunification.

effort to reunite with her family, she, unlike Hilliard and Mitchell, has no need for preliminary relief.

 Defendant argues that plaintiffs are collaterally estopped from arguing reasonable efforts were not made because the state Juvenile Court made findings that reasonable efforts were made. Although this court is to accord a decision of a state court the same preclusive effect that courts in that state would accord it, 28 U.S.C. § 1728, *Wozniak v. County of DuPage*, 845 F.2d 677, 680, 682 (7th Cir.1988), defendant cites no Illinois law in support of his collateral estoppel argument. Two of the requirements of collateral estoppel are that (1) the issues which form the basis of estoppel were actually litigated and decided on the merits in the prior suit and (2) those issues are identical to issues raised in the subsequent suit. *Id.* at 682–83 (quoting *County of Cook v. MidCon Corp.*, 773 F.2d 892, 898 (7th Cir.1985)).

 Unlike *res judicata*, collateral estoppel applies only to issues that were actually litigated, not also to issues that could have been raised in the prior proceeding, but were not. *Lester v. Arlington Heights Federal Savings & Loan Association*, 130 Ill.App.3d 233, 85 Ill.Dec. 619, 623, 474 N.E.2d 33, 37 (1985) (quoting *Godare v. Sterling Steel Casting Co.*, 103 Ill.App.3d 46, 50, 58 Ill.Dec. 588, 430 N.E.2d 620 (1981)). To have a collateral estoppel effect, an issue cannot simply be decided, but must be both actually litigated and decided. Where a court makes a finding on an issue that was not actually litigated, there is no collateral estoppel effect. *Lester*, 85 Ill. Dec. at 623–24, 474 N.E.2d at 37–38. *See also Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 469–70 (7th Cir.1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). Here, although the Juvenile Court judges made statutorily mandated findings that DCFS made rea-

sonable efforts to reunite the families, those were *pro forma* findings that were not actually litigated. Therefore, there can be no preclusive effect. Additionally, even if the issue was actually litigated, the Juvenile Court judges did not decide the same issues that are presently before this court because they only decided whether reasonable efforts had been made as of the time that they issued their rulings. *Cf. In re Overton*, 21 Ill.App.3d 1014, 316 N.E.2d 201, 206 (1974) (order of a court depriving a parent of custody of a child is only *res judicata* as to facts which existed at the time the order was entered); *In re Finch*, 40 Ill.App.2d 18, 189 N.E.2d 678, 679 (1963) (abstract opinion) (same). This court's findings relate to present circumstances. Plaintiffs' claims are not barred by collateral estoppel.

Consistent with his shotgun approach in opposing plaintiffs' motion, defendant argues that three abstention doctrines [15] go against granting relief in this case. Abstention has apparently only been raised in one reported federal case involving enforcement of the AAA; the limited argument made in that case was summarily rejected.[16] *See Joseph A.*, 575 F.Supp. at 350.

 Although not active cases, the Juvenile Court retains continuing jurisdiction over the custody proceedings of the children of Hilliard and Mitchell. *Finch*, 189 N.E.2d at 679. Absent an interested party petitioning for a modification, this means that the guardian or custodian appointed by the court must file updated case plans every six months. Ill.Rev.Stat. ch. 37, ¶ 802–28(2). Plaintiffs in this case do not seek any order from this court regarding custody nor do they seek to enjoin any action of the state court. While the state court may have the power to order the type of individual relief presently requested,

---

**15.** As the Seventh Circuit has noted, the doctrine set forth in *Colorado River* is more properly characterized as one of deference. "[T]he Supreme Court distinguishes between *Colorado River* deference and traditional abstention doctrines. We abide by that distinction here, while making no claim that we understand it." *Mede-*

*ma v. Medema Builders, Inc.*, 854 F.2d 210, 212 n. 1 (7th Cir.1988).

**16.** In at least one unpublished order, a district court declined to invoke *Younger* abstention. *See R.C. v. Hornsby*, No. 88–D–1170–N at 5–9 (M.D.Ala. April 19, 1989).

there is no active proceeding in which such relief is being sought. There is no basis for invoking *Younger* abstention in this case.

*Burford* abstention is appropriate only in cases involving difficult questions of state law and where review of that question would disrupt state efforts to establish a coherent policy respecting a matter whose importance transcends the result of the case under consideration. *Evans v. City of Chicago,* 689 F.2d 1286, 1295 (1982), *overruled on other grounds,* 873 F.2d 1007 (7th Cir.1989). Defendant does not point to any difficult question of state law involved in this case. Plaintiffs do not raise a challenge to any state statute or regulation; they instead charge that the state's actual practices do not measure up to the requirements of the AAA, a federal statute. This case does not involve interpreting the requirements of state statutes or regulations implemented pursuant to the AAA. There is no reason to invoke *Burford* abstention.

The first question to address in considering *Colorado River* deference is whether there are parallel proceedings. *Medema v. Medema Builders, Inc.,* 854 F.2d 210, 213 (7th Cir.1988). Cases are parallel if " 'substantially the same parties are contemporaneously litigating substantially the same issues in another forum.' " *Id.* This requirement is not satisfied; defendant points to no ongoing state proceeding in which the reasonable efforts question is presently being litigated. Even if the inactive Juvenile Court proceedings can be considered parallel proceedings, it is doubtful that this is an appropriate case for *Colorado River* deference. *See Interstate Material Corp. v. City of Chicago,* 847 F.2d 1285, 1288–89 (7th Cir.1988) (setting forth factors to consider). The custody proceedings are limited to the individuals involved and thus are not the appropriate place to litigate the systemic questions involved in this proceeding; the governing law in this case is federal; and the state cases are not presently active cases. Proceedings will not be stayed based on the *Colorado River* doctrine.

With respect to the standards for preliminary injunctive relief, the Court of Appeals for the Seventh Circuit has stated:

> Before a preliminary injunction will issue, the movant must show, as a threshold matter, that: (1) they have no adequate remedy at law; (2) they will suffer irreparable harm if the injunction is not granted; and (3) they have *some* likelihood of success on the merits in the sense that their "chances are better than negligible." *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–87 (7th Cir.1984); *see also Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir.1986). If the movant can meet this threshold burden, the inquiry then becomes a "sliding scale" analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits. In particular, and keeping in mind that the public interest may become important in a given case, the "more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor [in order to get the injunction]; the less likely he is to win, the more need it weigh in his favor." *Roland Machinery,* 749 F.2d at 387.

*Thornton v. Barnes,* 890 F.2d 1380, 1384 (7th Cir.1989) (quoting *Ping v. National Education Association,* 870 F.2d 1369, 1371–72 (7th Cir.1989)).

As stated by the magistrate,

> A likelihood of success on the merits has been shown with respect to Wanda Hilliard and Joann Mitchell but not with respect to Gina Johnson. Hilliard and Mitchell will be irreparably injured if DCFS does not do what the law requires it to do; they and their children are likely to sustain deep psychological injury and to have their relationships as families irreparably destroyed. There is no countervailing harm to the defendant; the cost of working out a viable service plan for these families is *de minimis.* Moreover, the defendant will save money if, by giving these plaintiffs modest assistance, it can get their children out of the foster care system. The public interest in this case is clearly expressed in the

AAA: unnecessary foster care placement is detrimental to the individuals involved and to the public.

Defendant argues that this summation fails to take into consideration the harm of interfering with the state judicial process and interfering with a caseworker's ability to exercise his or her own judgment. As previously discussed in regards to abstention, the recommended relief does not interfere with state court proceedings. As regards a caseworker's discretion, the recommended relief leaves to the caseworker the discretion to develop an appropriate plan. Defendant also argues that the interests of the children are ignored. The recommended relief, however, does not require that the children be reunited with their mothers. All that is ordered is that adequate procedures be followed so that the families may have the opportunity to be reunited if possible and appropriate. If it is not in the best interests of the children to be reunited with their mothers, presumably the caseworker will not make such a recommendation to the Juvenile Court and the Juvenile Court will not order such to occur.[17]

Defendant argues that the recommended relief is a mandatory preliminary injunction and that such relief should be granted in only rare circumstances. Typically, the purpose of a preliminary injunction is to maintain the status quo pending the resolution of the merits of a case. *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir.1978) (*per curiam*); *Desert Partners, L.P. v. USG Corp.*, 686 F.Supp. 1289, 1293 (N.D.Ill.1988). While mandatory preliminary injunctions are to be "cautiously viewed and sparingly issued," there are "situations justifying a mandatory temporary injunction compelling the defendant to take affirmative action." *Jordan, supra.* Where the harm is substantial and maintaining the status quo would mean further harm and possibly make a final determination on the merits futile, the grant of a mandatory preliminary injunction may be

appropriate. *See Ferry–Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir.1984); C.A. Wright & A. Miller, FEDERAL PRACTICE & PROCEDURE § 2947 at 424 (1973). Still, a mandatory preliminary injunction should not be granted unless the law and facts clearly favor the plaintiff. *Committee of Central American Refugees v. INS*, 795 F.2d 1434, 1441, *amended*, 807 F.2d 769 (9th Cir.1986). Also, a mandatory preliminary injunction that grants the full relief requested is viewed with greater disfavor than one that grants less than the full relief. *Bricklayers, Masons, Marble & Tile Setters, Protective & Benevolent Union No. 7 of Nebraska v. Lueder Construction Co.*, 346 F.Supp. 558, 561 (D.Neb. 1972); Wright & Miller, § 2948 at 445.

Here, the recommended preliminary relief does not grant the full relief sought; it does not result in a correction of the systemic problems alleged and heretofore proven nor is the broad relief requested in the First Amended Complaint granted. More importantly, the potential harm to plaintiffs is great. The longer they are separated from their children without an adequate effort being made to reunite the families, the less likely it is that reunification will be possible. If no preliminary relief is granted, continuation of present circumstances likely could result in any relief granted at the termination of this case being of no help to Hilliard or Mitchell. It cannot be overstated that permanent loss of the bond with one's child is one of the most extreme harms that a person can suffer and far outweighs any potential harm to defendant from the improvident grant of preliminary relief. Plaintiffs have made a strong showing both as to the likelihood of success and the balance of harms. This is one of those situations where issuance of a mandatory preliminary injunction is appropriate.

Defendant also argues that the recommended relief usurps the state's opportunity to decide in the first instance how to

---

**17.** Defendant makes no argument that the evidence shows that continued attempts at reunification would not be in the best interests of any of the children involved or that continued attempts at reunification would be futile. *See, e.g., Kenny F.*, 786 P.2d at 703–04.

best comply with the statute. That argument borders on the ridiculous. The recommended relief still leaves to the caseworker the development of the particulars of any case plan. It also continues to leave to DCFS the opportunity to develop a solution to systemic problems. The recommended relief does not unduly impinge on DCFS's opportunity to determine how to comply with the statute. *Compare Lynch,* 719 F.2d at 513–14.

■■■ Finally, defendant argues that the recommended relief violates the Eleventh Amendment because the report of the magistrate clearly indicates that appropriate action requires providing cash assistance in finding housing. But even assuming this to be true, there is no Eleventh Amendment problem because the Eleventh Amendment only prohibits awarding damages for past injuries. It does not prohibit ordering prospective relief that may result in future expenditures. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' motion for preliminary injunctive relief is granted as regards plaintiffs Wanda Hilliard and Joann Mitchell and denied as regards Gina Johnson.

(2) Within 14 days of the date of this order, defendant shall assign a caseworker or caseworkers, familiar with the requirements of the AAA, to meet with the Hilliard and Mitchell families and prepare written case plans relating to the possible return of each child to his or her home. The case plans shall (a) identify any housing obstacles to family reunification, (b) identify what if any resources are available to overcome such obstacles, and (c) specify how and when, if possible, such obstacles can be overcome.

(3) Copies of the plans ordered shall be provided to plaintiffs and their counsel within 21 days of the date of this order.

(4) Because of the poverty of plaintiffs, no preliminary injunction bonds are required.

## APPENDIX

## REPORT AND RECOMMENDATION

TO THE HONORABLE WILLIAM T. HART, one of the Judges of the United States District Court for the Northern District of Illinois.

## RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In their complaint in this action, plaintiffs, a putative class composed of "impoverished parents and legal guardians who have lost, are at risk of losing, will lose, or cannot regain custody of their children from the Illinois Department of Children and Family Services ("DCFS") because they are homeless or unable to provide food or shelter for their children," challenge:

defendant's policies and practices of (1) taking and retaining custody of children from impoverished parents and legal guardians because of their inability to obtain cash, food, shelter, or other subsistence, while failing to assist the parents and children to meet these needs; (2) failing to assist them to secure cash, food, shelter or other subsistence through the coordination of services to needy families and otherwise; (3) failing to make reasonable efforts to prevent removal of plaintiffs' children and reunite families; and (4) abridging the liberty and property interests of parents in retaining custody of their children and maintaining the means to support themselves and their families.

Plaintiffs allege that the challenged practices of defendant violate Title IV–B and IV–E of the Social Security Act, as amended by the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 620 *et seq.* and 670 *et seq.,* and the First and Fourteenth Amendments to the United States Constitution.

Plaintiffs initially moved for preliminary injunctive relief on behalf of two named plaintiffs, James Norman and Gina Johnson, seeking unspecified emergency relief. Following the hearing in this matter, plaintiff James Norman died, and his action

therefore abated. Thereafter, plaintiffs moved for preliminary injunctive relief on behalf of two additional members of the putative plaintiff class, Wanda Hilliard and Joann Mitchell, and an additional hearing was held relating to their claims.

Based on the evidence presented at these two preliminary injunction hearings, the court finds as follows:

## RECOMMENDED FINDINGS OF FACT

1. Defendant Gordon Johnson is the Director of the Illinois Department of Children and Family Services ("DCFS") and is charged by law with its administration. DCFS annually receives millions of dollars of federal funding pursuant to the Adoption Assistance and Child Welfare Act of 1980 ("AAA") to implement the programs mandated by that Act. The AAA provides in part that in order for a state to be eligible for federal funding, it must have a plan in effect which provides that "reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home...." 42 U.S.C. § 671(a)(15).

2. DCFS operates a state-wide Child Abuse Hotline. Calls received, if "accepted," are turned over to the Division of Child Protection ("DCP") which assigns an investigator, who must make an initial investigation within 24 hours of a call reporting abuse or neglect. The investigator makes a determination as to the validity of the report using a standard risk assessment form. (*See* DXs 8, 12.) If the investigator determines that there has been abuse or neglect, the report is termed "indicated." *See generally* Ill.Rev.Stat., ch. 23, ¶ 2057.14.

3. The DCP investigator may take the children into temporary custody if he determines that the circumstances or conditions of the children are such that continuing in their place of residence or in the care and custody of the person then responsible for the child's welfare presents an imminent danger to the children's life or health, and that there is no time to apply for a court order. Ill.Rev.Stat. ch. 23, ¶ 2055. Efforts are made to place the children with a relative. The DCP investigator advises the parent[s] of the children in person or through a letter that the children are being taken into temporary custody.

4. The DCP investigator is required by Illinois law to make "an evaluation as to whether there would be an immediate and urgent necessity to remove the child from the environment if appropriate family preservation services were provided." Ill.Rev. Stat., ch. 23, ¶ 2057.4(b)(3). In actuality, however, DCP investigators are not trained in what if any services may be available and do not in practice make an assessment of whether there are services available that would avoid the need to remove the children from their parents.

5. When DCFS takes temporary custody of children, it is required to bring them before a judicial officer within 48 hours, exclusive of Saturdays, Sundays and court holidays, for a temporary custody hearing to determine whether they should continue to be held in custody.

6. If a report is found "indicated," it is designated to a team of social workers. Within two to three weeks, a follow-up caseworker is assigned. Illinois law provides that at this stage, DCFS "shall assess the family's need for services, and, as necessary, develop, with the family, an appropriate service plan...." Ill.Rev.Stat., ch. 23, ¶ 2058.2. Illinois law further provides that DCFS "shall promptly notify children and families of the Department's responsibility to offer and provide family preservation services," defined generally as "all services to prevent the placement of children in substitute care, to reunite them with their families if so placed and if reunification is an appropriate goal, or to maintain an adoptive placement." Ill.Rev.Stat., ch. 23, ¶ 2058.2. (The statute provides that the availability of family preservation services shall be phased in during the 5 fiscal years following 1987.) The court finds that no such notification was provided in the case of any of the movant plaintiffs. According to Teresa Mayberry–Dunn, DCFS

Area Administrator, DCFS' primary responsibility at this stage is to deliver the services needed to achieve family reunification.

7. Among the reasons for which children may be removed from their parents' custody are "environmental neglect" and "inadequate shelter."

8. Ultimately, a permanent caseworker is assigned to the case. The caseworker is to develop a case or service plan usually with the ultimate goal of reuniting the family or achieving a permanent (non-foster care) placement for the children.

9. Families whose children are taken from them are ineligible for many welfare programs to which they would be entitled if they had custody of their children. In general, parents who have lost custody of their children are ineligible for aid to families with dependent children ("AFDC"), CHA housing and some programs of the Illinois Department of Public Aid ("IDPA"). Thus, the removal of children from a poor family may have the effect of disqualifying the family from receiving various types of public aid and services for which they would otherwise be eligible, thus seriously worsening their financial condition and disabling them from making the improvements in their material circumstances necessary to enable the family to be reunified. For instance, under normal circumstances, a parent whose income qualified him or her for CHA housing would be deemed ineligible for such housing if his or her children were removed; absent some special arrangement, if the parent were required to obtain housing in order to secure the return home of his or her children, and CHA housing were the only housing the parent could afford, the fact that the children were in DCFS custody would prevent the parent from obtaining CHA housing. Similarly, where a family's primary source of income is AFDC, removal of the children will leave the parent[s] with a drastically reduced income level. If the parent is required to demonstrate the existence of a materially adequate home environment to secure the return of his or her children, his or her ability to do so may be completely destroyed by the removal of the children. For these among other reasons, if families are not to be permanently separated, home environment problems related to lack of money must either be alleviated before the children are removed from the home or dealt with by means of coordination between DCFS and other welfare agencies, with exceptions made to usual eligibility policies. As defense witness Teresa Mayberry–Dunn testified, once DCFS has custody of a family's children, it becomes extremely difficult for the family to obtain assistance from agencies such as CHA, IDPA and DCFS. The result is a classic case of "Catch–22": the removal of the children renders the improvement in material circumstances necessary to secure the return of the children impossible.

10. In 1988, DCFS established a program called the Families First Initiative ("Families First"). Families First, defendant admits, is a response to the mandates of the AAA and to the Illinois Family Preservation Act. Like the statutes to which it responds, Families First reflects the prevailing view among social work and child care professionals that family preservation rather than foster care should, wherever possible, be the goal of intervention efforts since children do better if not separated from their families, as long as the families receive adequate support. (See PX 15; testimony of Diane Yost.[1]) The purpose of Families First is to provide comprehensive services, including homemaker services, counselling services and emergency assistance, including cash assistance, to maintain intact families and to reunify separated families as quickly as possible. Among the services that Families First is set up to provide are caretakers who can come into a home, counselling, and emergency funds to get utilities turned back on and to pay for rent and security deposits on apartments. Cash assistance of up to $500 per family

---

1. Where no page number is indicated, references are to untranscribed preliminary injunction hearing testimony.

may be provided. Intensive services are provided by Families First for 90 days with follow-up services thereafter. Certain CHA housing has been set aside for families served by Families First. (Testimony of Diane Yost.)

11. At present, by the terms of the Families First program, only 350 families statewide can be served by Families First at any one time. For a family to be eligible for Families First, there must be an indicated finding of abuse or neglect; there must be at least one child in the family under the age of 6; there must be an imminent risk of placement; and there must have been no more than three abuse or neglect reports. (Testimony of Diane Yost.) It has not been suggested that families not meeting these criteria could not equally benefit from this program. The court finds that the Families First program demonstrates DCFS' understanding of the objectives of the AAA and its understanding of and ability to implement the AAA's requirements that the states make reasonable efforts to prevent separation of families and to reunify them and that the states provide for coordinated services to achieve the AAA's objectives.

12. Apart from Families First, there are in the Cook County area a number of sources of emergency aid for families. IDPA administers a fund called "Special Assistance for Families Threatened with Separation due to Financial Reasons," which can provide allowances for rent, food, clothing and household supplies; a DCFS document states, "Public Aid acknowledges that this fund has not been used readily in the past." (PX 11.) The Harris Foundation established a fund, administered by DCFS, expressly for the purpose of allowing the reunification of children and their families when the children are in foster care "primarily because of the lack of adequate housing or utilities"; grants of up to $350 are allowed. (PX 14.) Small grants to assist families in obtaining housing are available through the Chicago Urban League, Catholic Charities and the Salvation Army. (Testimony of Smalley

Mike Cook.) The United Way Crusade of Mercy administers a number of programs including rent-mortgage assistance to help people who need one month's rent to obtain an apartment or avoid eviction, utility assistance to help people with past due bills or whose utilities have been disconnected and a shelter voucher program which can provide persons with up to 30 days of emergency housing in a hotel or motel. (Testimony of Margaret Hughes.) There is also a security deposit trust fund, set up by the Jewish Federation, by which homeless people can have their security deposits guaranteed. (*Id.*)

13. The practical problem with many of these sources of assistance is that they are rarely available unless family reunification is imminent. Since reunification cannot take place without a court order, since reunification can rarely be achieved without DCFS approval, and since a judge is unlikely to order reunification and DCFS is unlikely to approve it unless the parents have an adequate home to which the children can return, the parents rarely get access to these sources of assistance until they have substantially improved their environmental circumstances. In short, the parents cannot get assistance until it is clear that their children are about to be returned to them, and they cannot show that their children are about to be returned to them until they have improved their financial circumstances. Without a coordinated program to use these resources in conjunction with planning for the return of the children, the services which would permit the return of the children remain out of reach because, due to environmental conditions, the return of the children is not imminent.

14. The court finds on the basis of the expert social work testimony presented at the hearing that successful reunification of families frequently depends on prompt reunification. The more quickly needed services are provided, the more likely it is that the family will remain intact or be successfully reunited. Good social work practice dictates that case plans be developed and services be provided whenever possible within 48 hours of the children's removal from the family home. The court further

finds that removal of children from their parents, especially when prolonged, is likely to cause severe, irreparable emotional damage to the children and to their parents.

*Facts Relating to Gina Johnson and Her Children*

15. Gina Johnson is a 26–year–old single mother. She has five children: Wade Johnson, age 9; Randy Johnson, age 7; Cheryl Brown, age 5; Crystal Phillips, age 4; and Terrica Herron, age 3. (Johnson testimony, pp. 74–75.)

16. On March 13, 1988, Gina Johnson and her children were living at 5010 South Justine in Chicago. (Johnson testimony, p. 77.) Wade and Randy had three weeks earlier been returned to Ms. Johnson's custody from the custody of their father, who had at that point been incarcerated for murder. Randy had previously lived with Ms. Johnson for only four months, immediately following his birth. There was evidence that the boys had been abused and molested while they were in their father's custody. (Johnson testimony, pp. 76, 80.)

17. On March 13, 1988, Cheryl Brown woke up crying and told Gina Johnson she was bleeding from the vagina. Gina Johnson called an ambulance and Cheryl was taken to Mercy Hospital. (Johnson testimony, p. 82.)

18. Walter Henry, an investigator with the Division of Child Protection, Sex Abuse Unit, DCFS, responded to a call to the Child Abuse Hotline that Cheryl Brown had been abused. On March 13, 1988, Henry interviewed Gina Johnson at Mercy Hospital and later at the police station. (Henry testimony; Johnson testimony, pp. 106–107.)

19. Gina Johnson told Henry that Cheryl received her injuries when her brother Randy injected a stick from a window shade into her vagina. (Johnson testimony, p. 82; Henry testimony; DX 12.)

20. Henry also interviewed Cheryl's examining physician, Dr. Patterson of Mercy Hospital. (DX 12.) Dr. Patterson informed Henry that Cheryl Brown had been bleeding profusely from the vagina and had passed a blood clot the size of a baseball. It was the doctor's opinion that Cheryl's injury could not have been caused in the manner Gina Johnson described. Dr. Patterson informed Henry that Cheryl had a black eye, numerous bruises and welts on her body, and human bite marks on her body. (DXs 13–17; Henry testimony.)

21. Henry concluded that Cheryl's injuries evidenced long term sexual abuse. (Henry testimony; DX 12.)

22. Henry made an "indicated" finding of physical abuse, sexual abuse, and neglect. (Henry testimony; DXs 12, 18.) Gina Johnson's children were taken into temporary custody. (Johnson testimony, p. 84; Henry testimony.) Henry discussed with Gina Johnson the possibility of placing the children with relatives, but there was no suitable relative available. (Henry testimony.)

23. On March 16, 1988, a hearing on temporary custody of Gina Johnson's children was held in the Circuit Court of Cook County, Juvenile Division. Gina Johnson was represented by the Cook County Public Defender at this hearing. (Johnson testimony, p. 115.) The Cook County Public Guardian represented Gina Johnson's children at this hearing. A petition for temporary custody was filed and presented by the Cook County State's Attorney. (DXs 3, 7.) Johnson, through her public defender, stipulated to awarding temporary custody of her children to DCFS. (Johnson testimony, p. 116.) The court ordered that Gina Johnson's children be placed in the temporary custody of DCFS. (DXs 3, 7; Johnson testimony, pp. 115–116.)

24. The first service plan in the Johnson case appears to have been established April 1, 1988. Prepared by Betty Jenkins, a DCFS follow-up caseworker, at a meeting between Ms. Jenkins and Ms. Johnson, it provided that Gina Johnson would have at least one supervised visit with her children each week and would participate in counselling and parenting training through DCFS referrals. Ms. Jenkins referred Ms. Johnson to parenting classes at Mt. Sinai Hospi-

tal and to an organization called HELP for individual and group psychotherapy. (PX 4; Johnson testimony, pp. 85–87, 111.)

25. DCFS also arranged for counselling for Cheryl Brown at HELP and for Wade and Randy Johnson at South Central Community Services. (Johnson testimony, pp. 111, 114.)

26. The next service plan for Gina Johnson bears the date of September 28, 1988. The plan indicated that as of that date, the goals of participation in a psychological evaluation, participation in parenting training and supervised visitation had been met. Service tasks, with a planned achievement date of March 1989, included finding a permanent home and demonstrating stability, furnishing the home adequately, attending counselling, obtaining a G.E.D. and making supervised visits with her children. Ms. Johnson's primary caseworker at this time was John Mukasa–Ssebaana. (PX 7.)

27. Between March 1988 and December 1988, having lost her children and her eligibility for an AFDC grant, Gina Johnson lived in approximately five different residences. (Johnson testimony, pp. 77–79, 110.)

28. In December 1988, HELP referred Ms. Johnson to Sarah's Inn, a facility maintained by APAC (Austin People's Action Center). APAC provides apartments and job and home-finding counselling, among other services. (DX 25; Johnson testimony, pp. 111–112.)

29. Sarah's Inn provides Ms. Johnson with individual counselling and support groups focusing on emotional, physical and sexual abuse. (Ms. Johnson was herself an abused child and a ward of DCFS.) She has been provided with a four room apartment (living room, bedroom, kitchen and bath) in a building with other women, many of whom have their children with them, and is receiving counselling and support services at Sarah's Inn. Sarah's Inn charges Ms. Johnson no rent but reserves $123 per month of Ms. Johnson's monthly $154 general assistance and food stamp grant for the time when Ms. Johnson is ready to get her own apartment. As of the time of the hearing in this matter, Ms. Johnson had accumulated savings of approximately $600. Ms. Johnson's caseworker at Sarah's Inn is Sherry Parker. (PX 9; Johnson testimony, pp. 113–114; testimony of Sherry Parker.)

30. A December 27, 1988 Service Plan contains goals including: Ms. Johnson is to attempt to obtain her high school diploma, take her asthma medication, get counselling, join a family support group and retain an attorney to attempt to achieve the return of her children. Progress notes entered in her file indicate substantial progress toward these goals. (DX 26.)

31. A Service Plan of March 31, 1989, indicates:

> The natural mother continues in counseling and therapy at H.E.L.P. and A.P.A.C. She is reported to be making satisfactory progress. With the help of A.P.A.C., Gina has an apartment. The plan is for her to save enough money to obtain her own apartment. She applied for C.H.A. low income housing. Both her therapist at H.E.L.P. and her DCFS worker wrote letters of recommendation to C.H.A.

(DX 27.)

32. Despite the progress noted in the March 31, 1989 Service Plan, Ms. Johnson's caseworker did not recommend the return of her children. He explained, "The natural mother will have to demonstrate stability and independent functioning in her own apartment before a recommendation for the return of the children will be made." The Service Plan notes that Ms. Johnson has had regular supervised visits with her children and that "[i]f her satisfactory progress continues, she will be allowed some unsupervised visits." (DX 27.) It was the caseworker's view, as of the time of the hearing, that Ms. Johnson was not ready for unsupervised visits and that she would have to demonstrate adequate functioning in an unsupervised visitation setting for a period of approximately six months before he would recommend the return of her children. He further wants to see her in her own apartment, rather than in transitional housing such as Sarah's Inn, before he will recommend return of

her children. (Dep. of John Mukasa–Ssebaana, pp. 103, 117.)

33. There is a disagreement between Gina Johnson's caseworker Mr. Mukasa–Ssebaana and her counselor at Sarah's Inn as to her readiness for reunification with her children. Based on the counselling she has been given, Sarah's Inn personnel believe Ms. Johnson has made sufficient progress to justify unsupervised weekend visits with her three daughters. They recommend that if the unsupervised visits are successful, Ms. Johnson be reunited with her daughter Crystal after two months and with the other two girls, Terrica and Cheryl, at successive two-month intervals. (DX 29.) Ms. Johnson's caseworker at Sarah's Inn disagrees with Mr. Mukasa–Ssebaana's insistence that Ms. Johnson demonstrate an ability to function independently in her own household. Ms. Parker would prefer to see Ms. Johnson in transitional housing under Sarah's Inn's supervision so that the family's reunification can be closely monitored and assisted. Neither Ms. Johnson herself nor personnel at Sarah's Inn believes she is ready to take custody of her two boys at this time. (Johnson testimony, pp. 102, 121–122.)

34. DCFS policies dictate that when a private agency is involved in providing counselling to an individual whose children are in DCFS custody, that agency recommends reunification and the DCFS caseworker disagrees, a "staffing" should take place. A "staffing" is a conference with all the involved individuals and DCFS supervisory personnel. (Testimony of Teresa Mayberry–Dunn.) Despite the fact that a staffing was appropriate in Gina Johnson's case, no staffing had been held as of the time of the hearing before this court.

35. While Ms. Johnson's caseworker has indicated that he wants her to demonstrate "independent functioning" and "stability" before he will recommend the return of her children and wants her to demonstrate those qualities by, among other things, obtaining her own apartment outside the protective context of Sarah's Inn, this court is persuaded that it is not his purpose to impose a financial condition upon her for the return of her children but to satisfy his concerns about her ability, on a sustained basis, to undertake the responsibilities of being a parent. He testified that he has not required her to accomplish tasks (such as obtaining CHA housing) before her children are returned that she cannot as a practical matter accomplish until her children are returned; he testified that he is able, through coordination with CHA, to obtain CHA housing for various clients pending reunification with their children. (Dep. of John Mukasa–Ssebaana, p. 119.)

36. Since the hearing in her case, Ms. Johnson has obtained a 3–bedroom CHA apartment and has been granted overnight visits with her children by order of the juvenile court. One such visit took place, but there were no beds for the children. Additional overnight visits have not been allowed due to the lack of beds. Ms. Johnson's caseworker has requested a cash assistance grant for her from the Harris Fund, but no funds have been provided to date. (Stipulation regarding Gina Johnson, filed December 21, 1989.) In a stipulation filed by the parties regarding plaintiff Wanda Hilliard, it is stated that due to fiscal limitations, no Harris Fund monies will be available to families whose applications were processed and approved before January 1, 1990.

37. The court is persuaded that there is a difference of professional opinion between Sarah's Inn personnel and Mr. Mukasa–Ssebaana concerning Gina Johnson's readiness for family reunification. Ms. Johnson has received extensive counselling and coordinated services as a result of DCFS referrals and a meaningful Service Plan has been assembled with conscientious follow-up. While the court may or may not agree with Mr. Mukasa–Ssebaana's professional judgment as to whether Ms. Johnson's children should be returned to her at the present time, it is persuaded that in Gina Johnson's case, the defendant

has, at least to date, made reasonable efforts to achieve family reunification.[2]

*Facts Relating to Wanda Hilliard and her Children* [3]

38. Wanda Hilliard is the mother of five children: Marvel Hunter, age 12; Kimberly Hunter, age 7; Christopher Duncan, age 6; Ebony Hilliard, age 1; and a newborn infant.

39. In 1987, Ms. Hilliard and her children were living with Ms. Hilliard's sister, Queen Esther. On or about August 9, 1987, Queen Esther called DCFS and complained that Ms. Hilliard had left the premises leaving no money for the children and no care plan. DCFS took Christopher and Kimberly into protective custody. Ultimately DCFS was given temporary custody of Christopher, Kimberly and Marvel. The reason for the removal of the children from their mother was an indicated finding of inadequate food and inadequate supervision. (*See* Stipulation, ¶ 4.)

40. The three children removed by DCFS were placed in foster care with their maternal grandmother, where they remain to this date.

41. Subsequent to the removal of her children, Ms. Hilliard lived with friends and in shelters. Since August 11, 1989, Ms. Hilliard has been living in a studio apartment with her two youngest children, both born after the three oldest children were removed from her custody. The studio apartment, besides the inadequacy of its size, has heating and water problems. It had no heat on the day Ms. Hilliard testified, when the outside temperature was approximately 10 degrees.

42. Ms. Hilliard's sole source of support is her $250 AFDC grant. (This grant will increase to $342 in January, as a result of the birth of Ms. Hilliard's youngest child.)

Ms. Hilliard pays $225 per month rent out of this grant.

43. Ms. Hilliard has had three DCFS caseworkers. At various times, service plans were drafted which required her to undergo counselling, parenting training and drug testing. Ms. Hilliard has completed all the tasks which DCFS views as preconditions to the return of her children other than finding adequate housing. It is the view of the caseworker supervisor with responsibility for the Hilliard case that the only existing obstacle to reunification of the Hilliard family is Ms. Hilliard's need for a larger apartment. (Stipulation, ¶¶ 7, 8.)

44. Despite Ms. Hilliard's many requests for housing assistance from DCFS, including written requests by her attorney for cash assistance (*see* PX 79), she has received no cash assistance, no referrals for housing and no help in locating housing. The only exception to this is that DCFS has made contact on her behalf with the Chicago Public Housing Authority; however, Ms. Hilliard is not eligible for public housing. (Stipulation, ¶ 12.)

45. Ms. Hilliard's DCFS caseworker never filed a Harris Fund request. The DCFS caseworker supervisor, Earl Pleasant, completed a Harris Fund request for $500 for Ms. Hilliard on December 1, 1989. (Stipulation, ¶ 9.)

46. Due to fiscal limitations, no Harris Funds will be available to families whose applications have been processed and approved before January 1, 1990; none have been made available to Wanda Hilliard. (Stipulation, ¶ 10.)

47. The Harris Fund is not the only means by which a caseworker can obtain cash for a family. (*See* Defendant's Answers to Plaintiffs' Requests to Admit # 1.) Using a procedure known as "exception to policy" or "exceptional payment request"

---

**2.** As explained more fully below, *see* n. 8, *infra,* the suspension of visitation between Ms. Johnson and her children because of lack of beds is troubling to the court, but no evidence has been presented as to whether there are reasonable efforts defendant could make but has failed to make that could rectify this situation.

**3.** Except where otherwise indicated, these fact-findings are based on the untranscribed testimony of Ms. Hilliard.

in which a caseworker submits a written request for special funds to her supervisor, Ms. Hilliard's caseworker, in July 1989, obtained $650.00 to send the children to camp. (PX 76. *See also* PX 62: Exceptional payment to plaintiff Joann Mitchell for bus pass and shoes.) There was no evidence as to whether or not exceptions to policy can be used to secure housing assistance.

48. Wanda Hilliard has custody of her two youngest children and DCFS has no indicated reports concerning them. DCFS has taken no action to remove the two youngest children from her custody. (Stipulation, ¶ 11.)

49. DCFS has provided no transportation assistance for Ms. Hilliard to locate housing or work.

50. Ms. Hilliard is mildly developmentally delayed; special training may be necessary if she is to find and keep employment. (Dep. of Denise Kane.) She is a mentally healthy individual, however, who has been cooperative with DCFS and has shown concern about her children.

51. Ms. Hilliard's AFDC grant will increase in January to $342.00. If all her children were returned to her, her AFDC grant would be $452.00. She has looked for housing for her family and cannot find even a one-bedroom apartment for less than $300.00. She would need approximately $1500 initially to secure a two-bedroom apartment, assuming rent of $500.00 per month. Without financial assistance, Ms. Hilliard will be unable to procure housing adequate to satisfy DCFS' requirements for the return of her children.

52. Ms. Hilliard has experienced depression and loss of sleep since her children were removed. She is upset and wonders when they will return. Her children have experienced stress and a loss of confidence in their mother.

53. Ms. Hilliard has frequently and consistently visited her children. DCFS' stat-

ed goal for the family has always been reunification. (PXs 71–73.)

54. Ms. Hilliard's current service plan requires Ms. Hilliard to secure stable housing but provides no direction as to how she is to achieve that goal, which appears beyond her reach. (PX 89.)

*Facts Relating to Joann Mitchell and her Children* [4]

55. Plaintiff Joann Mitchell is the mother of five children: Sebastian, age 22; Melissa, age 21; Nicole, age 11; Christian, age 10; and Dominick, age 5.

56. Sebastian and Melissa are not minors and have their own households. DCFS took protective custody of Nicole, Christian, and Dominick on December 4, 1985, and the children were placed in foster care with Ms. Mitchell's aunt, Jonnie Evans, where they remain today.

57. Ms. Mitchell's children were originally removed by DCFS on December 4, 1985, when the man with whom Ms. Mitchell shared an apartment reported her to DCFS as having abandoned her children. There is evidence that the reporter may have lied to the police to get Ms. Mitchell's family out of the apartment. Ms. Mitchell testified that she had left the children in this man's care while she left the apartment for a few hours.

58. The DCP worker indicated Ms. Mitchell for "inadequate supervision" because the children were without a caretaker. Ms. Mitchell was arrested for abandoning her children and taken into custody. The charge of abandonment was never prosecuted.

59. Ms. Mitchell was receiving $385 in AFDC benefits when her children were taken by DCFS. After the children were taken, her grant was cancelled. She had no income until she began receiving General Assistance, $154 per month, two months later.

60. After her children were taken into DCFS custody, Ms. Mitchell repeatedly

**4.** Except where otherwise indicated, these fact-findings are based on the untranscribed testimo-

ny of Ms. Mitchell.

called DCFS to inquire about her children. DCFS never called her back. At the end of January, 1986, approximately six to seven weeks after the children were taken, Ms. Mitchell finally learned from a friend that the children had been placed with Ms. Evans.

61. On May 21, 1986, Judge Aaron of the Juvenile Court vacated the December 1985 order granting temporary custody of the Mitchell children to DCFS. Ms. Mitchell testified that the judge told the caseworker, Ms. Sheila Johnson, to pick up the children and bring them to Ms. Mitchell's apartment. Despite Ms. Mitchell's repeated complaints, the children were not returned. Ms. Mitchell did not go to the foster home herself to pick up the children because the judge had instructed her not to do so.

62. DCFS took temporary protective custody of the three Mitchell children shortly thereafter on June 5, 1986, alleging that Ms. Mitchell had no place for the children to live. (PXs 36, 37.) On June 11, 1986, DCP again indicated Ms. Mitchell for "inadequate supervision" because she did not have enough room for the children in her apartment. DCFS' risk assessment form indicates that Ms. Mitchell should "check into getting an apartment so she can regain custody of her children." (PX 40.) Before retaking custody of the Mitchell children, DCFS offered no services to Ms. Mitchell. (PX 42.)

63. To date, DCFS has prepared six service plans for Ms. Mitchell, dated 1/23/86; 12/2/86; 6/22/87; 12/16/87; 7/25/88; and 12/5/89. (PXs 34, 45, 46, 47, 48, 56.) Ms. Mitchell did not participate in preparing any of these plans and was not present when they were drafted.

64. While none of these service plans identifies housing as a condition for the reunification of the Mitchell family, caseworker Sheila Johnson told Ms. Mitchell that she had to secure a three bedroom apartment before the children could be returned to her. None of the service plans commit DCFS to providing housing assistance and/or referrals to Ms. Mitchell, or otherwise mention any housing assistance that DCFS will provide to Ms. Mitchell.

65. Ms. Mitchell asked her first caseworker, Sheila Johnson, for assistance in getting an apartment. Ms. Johnson never provided Ms. Mitchell with any assistance in securing housing and refused Ms. Mitchell's requests for assistance with her job search and transportation.

66. Ms. Mitchell also asked her present caseworker, Sherra Jackson, for assistance securing housing, including cash. Ms. Jackson states that she knows of no cash assistance available for housing and that she does not know whether referral to outside agencies for cash is appropriate. (Dep. of Sherra Jackson, pp. 39–41.) She has received no training in how to assist families with poverty-related problems such as lack of housing or lack of food. (Dep. of Sherra Jackson, p. 38.) Caseworker Jackson has obtained exceptional cash assistance for Ms. Mitchell on two occasions, once for transportation to job interviews and realty agencies (PX 62) and once for special shoes needed for a job Ms. Mitchell had obtained (PX 63).

67. Ms. Mitchell completed counselling DCFS required of her in June 1989. The counselor, Terry Henderson, issued a report on September 23, 1988, recommending that the children be returned home as soon as housing was secured. (PX 49.)

68. Since December 1988, Ms. Mitchell has been homeless, moving from shelter to shelter. Each shelter has limits on the length of time one can stay. Each shelter also has requirements that its residents attend various meetings and perform various chores. Ms. Mitchell's ability to search for employment and housing has been limited by these requirements.

69. DCFS caseworkers have sporadically scheduled supervised visitation for Ms. Mitchell and have then failed to appear themselves. Ms. Mitchell appeared for three scheduled visits but after the third visit, Ms. Evans, the foster care provider, refused to allow Ms. Mitchell into her home. Ms. Mitchell has arranged visits on her own, but DCFS has failed to assist in implementing any regular visitation.

70. According to expert social worker Denise Kane, visitation between Ms. Mitchell and her children should be undertaken immediately to prevent irreparable damage.

71. In December 1988, Ms. Mitchell discovered bruises on her son Christian's body, from his waist to his ankles. Christian told his mother that his cousin had beaten him. Ms. Mitchell reported the abuse to DCFS, who investigated and found the case indicated for abuse. (PXs 50–55.) DCFS did not remove the children from the foster care placement and they still remain there.

72. According to expert social worker Denise Kane, upon thorough review of the Hilliard and Mitchell DCFS files, reasonable efforts have not and are not being made to reunite these women with their children. (Dep. of Denise Kane, pp. 26–35, 62–78, 79.)

## RECOMMENDED CONCLUSIONS OF LAW

Defendant has advanced a battery of theories in support of its contention that plaintiffs are entitled to no relief. These include (1) that the court should abstain from deciding this case because of the pendency of state juvenile court proceedings involving the issue of placement of the plaintiffs' children; (2) that plaintiffs' claims are barred by collateral estoppel in that the state court, in awarding temporary custody of plaintiffs' children to DCFS, was required under state law to find that DCFS had made "reasonable efforts" to prevent removal of the children from their families; (3) that there is no private right of action under the AAA, and the AAA cannot be enforced through § 1983 because the AAA's own remedial provisions are sufficiently comprehensive to evince congressional intent to preclude § 1983 actions; and (4) that plaintiffs are in essence seeking a mandatory injunction that would, if granted, violate the Eleventh Amendment.

### Abstention

Defendant's first contention can be easily disposed of since the abstention doctrine has no application here. Plaintiff parents seek injunctive relief against the Director of DCFS for allegedly violating federal law in a manner which effectively disables plaintiffs from being able to provide an adequate environment for their children. The issue before the Juvenile Court—whether, given the family's circumstances, the children should be in the custody of their parents or in foster care—is a completely different question. As the court stated in *R.C. v. Hornsby*, Cir. No. 88–D–1170–N (M.D.Ala.1989), an action such as this is not an attempt "to interfere with state court custody determinations, procedures, or any other issue properly before a state court." *Id.* at 8. The fact that if the plaintiffs were given the assistance and services to which they claim they are entitled, a state court might decide the custody issue differently, does not amount to interference with the state court proceedings.

Defendant also asserts, without elaboration, that plaintiffs could raise their claims in the state court custody proceedings. This court finds it hard to take this suggestion seriously. State courts hearing custody matters must take the parties as they find them and do the best that they can for the children given things as they are. They are hardly in a position to try the issue of whether DCFS is properly administering federal funding programs.

### Collateral Estoppel

Defendant's collateral estoppel argument is similarly meritless. The reach of this doctrine was described by the Court of Appeals in *Kunzelman v. Thompson*, 799 F.2d 1172, 1176 (7th Cir.1986), as follows:

In general, collateral estoppel precludes relitigation of issues in a subsequent proceeding when: (1) the party against whom the doctrine is asserted was a party to the earlier proceeding, (2) the issue was actually litigated and decided on the merits, (3) the resolution of the particular issue was necessary to the result, and (4) the issues are identical.

Illinois law requires that before the Juvenile Court orders a minor removed from his or her home, the court must make a finding, on the basis of documentation provided by DCFS, "that reasonable efforts have been made or that good cause has been shown why reasonable efforts cannot prevent or eliminate the necessity of removal of the minor from his or her home...." Ill.Rev.Stat., ch. 37, ¶ 802–10(2). The court is required, in addition, to "state in writing its findings concerning the nature of the services that were offered or the efforts that were made to prevent removal of the child and the apparent reasons that such services or efforts could not prevent the need for removal." *Id.*

There is no evidence that the "reasonable efforts" issue was actually litigated before the Juvenile Court in any of the cases before this court. In the case of three of the Johnson children, the required finding is not made at all; in the case of Cheryl Brown, the form contains the entry, "appropriate services aimed at family preservation and family reunification have been unsuccessful." (DX 4–7.) There is, however, nothing in this record to suggest any services were provided to the Johnson family prior to the children's removal. In the case of Joann Mitchell's children, the pre-printed temporary custody order forms recite that reasonable efforts have been made to avoid removal (PX 64), but it is uncontested that in fact no efforts had been made; Joann Mitchell was immediately taken into custody and charged with neglect. The Hilliard records similarly contain pre-printed disposition orders on which the language, "That appropriate services aimed at family preservation and family reunification have been unsuccessful," is noted with a checkmark. The record, however, is clear that no services were provided. Moreover, in none of these cases did the court include in its order the required written findings concerning what services or efforts were made and why they appear to have been unsuccessful.

Even if the issue of "reasonable efforts" had been litigated in the Juvenile Court proceeding, collateral estoppel would not bar the instant action since the issue here is not identical to the issue in that context. Here, the question is what the AAA requires, not whether, on the basis of non-statutory discretionary standards, DCFS acted reasonably. Accordingly, collateral estoppel does not bar litigation of plaintiffs' claims here.

### Enforcement of the AACWA through a § 1983 Action

Title 42 U.S.C. § 1983 provides a federal remedy for state violations of federal statutory law. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). However, before a § 1983 action can be premised on the alleged violation of a federal statute, it must appear that Congress intended, in enacting the statute alleged to be violated, to create enforceable rights and obligations. Where a funding statute is alleged to have been violated, as is the case here, the plaintiff must show that Congress intended to condition the grant of federal funds on the state's provision of the rights allegedly denied. *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 23, 101 S.Ct. 1531, 1543, 67 L.Ed.2d 694 (1981). Put another way, the funding statute must make clear that it is imposing an obligation on states accepting funding pursuant to its provisions to provide certain rights or benefits. *Id.* at 25, 101 S.Ct. at 1544. Even if plaintiffs can demonstrate the statute's intent to create enforceable rights, they are not entitled to relief if the defendant can show that the statute allegedly violated contains within itself a remedial scheme sufficiently comprehensive to demonstrate congressional intent to exclude a § 1983 cause of action. *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623–2624, 69 L.Ed.2d 435 (1981).

The AAA provides for payments to states which have child welfare plans meeting specified federal criteria. Title 42 U.S.C. § 622 states that "[i]n order to be eligible for payment under this part, a State *must* have a plan for child welfare services ... which meets the *requirements*

of subsection (b) of this section." (Emphasis added.) Under the designation "Requisite features of State plans" set out in subsection (b), the statute states that "[e]ach plan for child welfare services under this part *shall*—."

\* \* \* \* \* \*

(2) *provide for coordination between the services provided for children under the plan and the services and assistance provided under* subsection XX of this chapter [block grants to states for social services, 42 U.S.C. §§ 1397–1397f], under the State plan approved under part A of this subchapter [AFDC programs including employment training programs, food stamp programs, 42 U.S.C. §§ 601–615], under the State plan approved under Part E of this subchapter [federal payments for foster care and adoption assistance, 42 U.S.C. §§ 670–676], and under other State programs having a relationship to the program under this part, *with a view to provision of welfare and related services which will best promote the welfare of such children and their families. . . .*

(Emphasis added.)

Title 42 U.S.C. § 627(a) provides for distribution to the states of certain appropriations but makes clear that "a State shall not be eligible for payment" from these appropriations "unless such State . . . has implemented and is operating . . ." various programs including:

(2)(B) a case review system (as defined in section 675(5) of this title) for each child receiving foster care under the supervision of the State; and

(C) a service program designed to help children, where appropriate, return to families from which they have been removed or be placed for adoption or legal guardianship.

Further, § 627 provides for reduction of a State's allotment to 1979 levels if these programs are not in operation. § 627(b)(2).[5]

Section 675(5) defines the case review system required by § 627 as follows:

The term "case review system" means a procedure for assuring that—

(A) each child has a case plan designed to achieve placement in the least restrictive (most family like) setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child,

(B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review (as defined in paragraph (6)) in order to determine the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to the home or placed for adoption or legal guardianship. . . .

Title 42 U.S.C. § 671(a) also specifies that "[i]n order for a State to be eligible for payments under this part," it must have a plan in effect, approved by the Secretary, which, among other things:

\* \* \* \* \* \*

(4) provides that the State shall assure that the programs at the local level assisted under this part will be coordinated with the programs at the State or local level assisted under parts A and B of this subchapter, under subchapter XX of this chapter, and under any other appropriate provision of federal law;

\* \* \* \* \* \*

(15) effective October 1, 1983, provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home; and

(16) provides for the development of a case plan (as defined in Section 675(1) of

---

**5.** Plaintiffs rely on these sections. Defendant has not suggested that they are inapplicable due to any failure of Congress to appropriate the funds referred to.

this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to such child. . . .

Section 675(1), defining the required "case plan," provides:

*The term "case plan" means a written document which includes* at least the following: A description of the type of home or institution in which a child is to be placed, including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child in accordance with section 672(a)(1) of this title; and *a plan for assuring that the child receives proper care and that services are provided to the parents, child and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own home or the permanent placement of the child,* and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan. . . .

(Emphasis added.)

Numerous cases hold that the AAA establishes rights which may be enforced in a § 1983 action. *Lynch v. Dukakis,* 719 F.2d 504 (1st Cir.1983), affirmed a district court holding that the AAA creates enforceable rights to a "case plan" and a periodic review of that plan for each child in the state's foster care. In *L.J. By and Through Darr v. Massinga,* 838 F.2d 118 (4th Cir.1988), the court held generally that the provisions of the AAA "spell out a standard of conduct, and as a corollary rights in plaintiffs." 838 F.2d at 123. And in this district, Judge Grady, in *B.H. v. Johnson,* 715 F.Supp. 1387 (N.D.Ill.1989), ruled that the AAA creates enforceable rights to an individualized case plan and case review system. *Id.* at 1402. *See also*

*Artist M. v. Johnson,* 726 F.Supp. 690, 697 (N.D.Ill.1989). These cases similarly concluded that the AAA does not contain within itself a remedial scheme sufficiently comprehensive to indicate Congress' intent to preclude a private right of action. *Lynch, supra* at 510–511; *B.H. v. Johnson, supra* at 1403; *Artist M., supra.*

It is thus clear that a § 1983 suit may be utilized to enforce appropriate provisions of the AAA. The issue here, then, is whether the wrongs plaintiffs allege are within the scope of the enforceable rights the AAA creates. The defendant argues that plaintiffs are in essence asserting a right to cash assistance and other "substantive services" and that no such rights are inferable from the provisions of the AAA. They rely on, among other things, Judge Grady's opinion in *B.H. v. Johnson, supra,* holding that while the AAA creates enforceable rights to an individualized case plan and case review system, the AAA's enforceable rights are limited to these monitoring procedures and do not encompass such "sweeping rights . . . as the right to an adequate number of case workers, family reunification services, services to 'troubled families,' or rights of meaningful visitation between siblings." *Id.* at 1402. *See also Scrivner v. Andrews,* 816 F.2d 261, 264 (6th Cir.1987).

Subsequent to Judge Grady's decision in *B.H.,* Judge Shadur issued a decision in *Artist M. v. Johnson,* 726 F.Supp. 690 (N.D.Ill.1989). In this decision, Judge Shadur concluded that the AAA's clear mandatory language requires recognition of some enforceable rights beyond the rights to a case plan and case review system identified by Judge Grady. Specifically, Judge Shadur found, after a review of the language of the AAA and its legislative history, that Congress intended to require that the states provide preventive and reunification services and that the AAA *mandates* that "reasonable efforts" to prevent separation and achieve reunification be made. *Id.* at 694 and n. 6. He stated:

Courts have consistently confirmed Section 1983—enforceable rights to case plans and case review systems. This Court has already found those statutory

commands equivalent to those called upon by plaintiffs here. And to the extent that *B.H., id.* at 1401 concluded that AAA's "reasonable efforts" provisions failed to meet the "clear" and "unambiguous" standard expressed in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981), as necessary to create a "contract" between the State and the federal government, this Court must again disagree. Any State that read (or for that matter neglected to read) AAA and accepted federal funds under it had to know it was obliged both to provide case plan and case review services *and* to provide services aimed at preventing removal and facilitating reunification.

*Id.* at 696. (Citations and footnotes omitted.)

The Supreme Court has made clear that in determining whether a statute should be read to give rise to enforceable rights, "[t]he key to the inquiry is the intent of the Legislature." *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981). In dealing with a statute enacted pursuant to Congress' spending power, which provides for the disbursement of federal funds to states which agree to comply with federally-imposed conditions, it is particularly important that Congress make its intent clear, since the legitimacy of Congress' attempt to legislate in this manner "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State School v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). The court must look to the statute to determine whether Congress clearly "imposed an obligation on the States to spend state money to fund certain rights as a condition of receiving federal monies under the Act or whether it spoke in precatory terms." *Id.* at 19, 101 S.Ct. at 1541. It must also be clear that Congress intended to benefit persons such as plaintiffs. *See Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 430, 107 S.Ct. 766, 774, 93 L.Ed.2d 781 (1987).

Title 42 U.S.C. § 622 states, in unambiguous terms, that in order to be eligible for federal funds under the AACWA, the state must have in effect a plan for child welfare services which complies with certain specified requirements, among them, coordination between the services provided for children under the plan and "services and assistance" provided under a number of other listed programs. Title 42 U.S.C. § 627 provides that a State shall not be eligible for payment under that section unless it has implemented and is operating a case review system for each child in foster care (defined in § 675(5)) and a "service program" designed to help children, where appropriate, return to families from which they have been removed. "Case review system" is defined as a procedure which will assure that each child has a case plan designed to achieve certain specific objectives and that the status of each child is reviewed no less frequently than every six months in order to determine (1) the need for placement, (2) compliance with the case plan, and (3) the extent of progress in alleviating the causes requiring foster placement. Section 671 also specifies that in order for a state to be eligible for funds under that section, it must have in effect a plan which provides for coordination with other state and local welfare programs and provides for a case plan and case review. Section 671 further specifies that the plan in effect must provide that "in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home." 42 U.S.C. § 671(a)(15). The case plan, which is a required part of the case review system mandated by 42 U.S.C. § 627, must, by the express terms of § 675(1), include "a plan for assuring that the child receives proper care and that services are provided to the parents, child and foster parents in order to improve the conditions in the parents' home [and] facilitate return of the child to his own home...."

On the basis of the unambiguous wording of this statute, this court agrees with

Judge Shadur that Congress made clear its intent to require preventive and reunification services. There must be a case plan, there must be case review no less frequently than every six months, there must be coordination with other social welfare programs, and there must be "reasonable efforts" to prevent or eliminate the need for removal of the child from his home or to make it possible for the child to return to his home. 42 U.S.C. § 671. The case plan defined in detail in § 675(1), must include a plan for assuring that proper care and services are provided to the child and the parents "in order to improve the conditions in the parents' home, facilitate return of the child to his own home [or adoption], and address the needs of the child in foster care, including a discussion of the appropriateness of the services that have been provided under the plan."[6]

Any difficulty presented by these statutory provisions inheres not in Congress' failure to make clear their obligatory nature. Congress not only expressed itself in the language of obligation, but left no room for doubt that compliance with these provisions was a condition of receiving federal funds. It stated clearly that appropriate services must be provided to the children and their parents to prevent removal and facilitate reunification, that coordination with other welfare programs must be provided for and that reasonable efforts to prevent the need for removal and to make

it possible for the child to return home must be made. Congress explicitly provided for a case plan and case review system to achieve these explicit objectives. Facilitating reunification of parents and children in foster care is the unambiguous purpose of this legislation and the unambiguous reason federal tax dollars are being distributed to Illinois.[7] What difficulty there is inheres rather in the lack of any clear definition of what is specifically required. "Coordination" is required, but it is not clear from the statute exactly what coordination entails. "Reasonable efforts" are required, but "reasonable efforts" are nowhere defined.

Congress' failure to spell out exactly what the state is required to do in each case is not surprising, given the vast diversity in the problems and potential solutions individual cases present. Nor is it particularly difficult for a court, once shown the facts of an individual case, to determine whether there have been reasonable efforts at coordinated services. As Judge Shadur observed in this regard:

> Courts have long proved themselves adequate to the task of enforcing contractual "best efforts" obligations, and they equally regularly enforce commitments of parties to conduct themselves "reasonably."

*Artist M., supra* at 695, n. 6.

Gina Johnson's service plans, for all the controversy about their wisdom, did, in this

---

6. The court would note that Judge Grady rendered his opinion in *B.H.* on a motion to dismiss, presumably without a fully-developed factual record. Having heard the evidence relating to the specific case histories of the plaintiffs before the court, this court is persuaded that simple monitoring, without efforts aimed at family reunification or permanent placement, is of no more efficacy than no monitoring. Unless the monitoring is for a purpose, unless it is performed in service of an objective, and unless it is accompanied by reasonable efforts to accomplish the law's objectives, it becomes a meaningless paperwork requirement.

7. Defendant has argued that even if the AAA can be enforced in a § 1983 action and even if there is a private right of action under the AAA, parents are not the "especial" beneficiaries of the statute and they have no cause of action. The

court cannot accept this reading of the statute. The AAA's primary focus is not children or parents but families. Its provisions stress repeatedly the importance of family unification. While it is undoubtedly true that the AAA is concerned with families because it views families as critical to the well-being of children, its emphasis on the family unit indicates to this court an intention that children *or* their parents should be able to seek to have the Act enforced. The court notes in this connection that the Act speaks of the "provision of welfare and related services which will best promote the welfare of ... children and their families," 42 U.S.C. § 622(b)(2), and requires that a case plan include a plan ensuring that "services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home...." 42 U.S.C. § 675(1).

court's judgment, satisfy the law's requirements. DCFS looked closely at the problems of Ms. Johnson and her children and made referrals which led, directly or indirectly, to the services which have so improved her and her children's circumstances. It is not this court's role to say whether Ms. Johnson and her children should be reunited. But it can say that the emergency that precipitated the removal of Ms. Johnson's children from her custody made reasonable DCFS' failure to provide services and counselling before the children were removed and that shortly after removal, meaningful goals were set and meaningful assistance toward those goals rendered to alleviate the causes for which the children were removed and to make reunification feasible.[8]

The Hilliard and Mitchell cases are different. It appears to be uncontroverted that DCFS would be willing to recommend reunification of these families if the mothers had adequate housing for their children. It also appears clear that if the families were reunified, their AFDC grants would be sufficient to permit them to maintain such housing. Hence, from the record before this court, it appears that the only obstacle to the reunification of these families could be overcome with a proper housing referral and possibly some cash assistance, either from DCFS or from another agency. The court need not make judgments on the question of whether DCFS has made reasonable efforts to reunify these families in the past to conclude that federal law requires that reasonable efforts be made now. If there is no obstacle to reunification other than housing, the service plan should either contain some program for obtaining such housing or document why no program is possible. To continue the separation of these mothers from their children indefinitely for want of housing, when returning the children would ensure an adequate AFDC grant to

obtain the necessary housing, is not only conscience-shocking, but is precisely the kind of pointless separation of families Congress enacted the AAA to prevent.

Plaintiffs have demonstrated that many DCFS caseworkers are not trained to implement the requirements of federal law and that if programs for providing coordinated services exist, some caseworkers are unaware of them. The court need not address these systemic problems to conclude that plaintiffs Hilliard and Mitchell have a right, under the unambiguous provisions of the AAA, to meaningful service plans prepared by persons aware of the requirements of federal law and aware of what resources are available to achieve family reunification.

### Implied Private Right of Action

Plaintiffs further maintain that the AAA creates an implied private right of action to enforce its provisions. In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court identified four factors as relevant in determining whether a private remedy is implicit in a statutory provision:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted...." Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? .... Third, is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the State, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

Plaintiffs manifestly satisfy the *Cort v. Ash* test. Despite the defendant's contention that the AACWA's concern is with

---

8. The court is concerned about the evidence presented after the Johnson hearing that the family visitation which Ms. Johnson's caseworker and social worker recommended has been suspended due to lack of beds. (*See* Findings

# 36, *supra*.) There is no evidence before the court that Ms. Johnson's caseworker has failed to try to solve this problem. If there were such evidence, the court might be inclined to reach a different conclusion as to the Johnson case.

children and that children are its "especial" beneficiaries, this court views this law as focused on families, both parents and children. Unquestionably, the law's *motivation* is fostering the best interests of children, but its dominant idea is that the welfare of children is inextricably tied up with the welfare of families. Where a statute explicitly provides for assistance to parents so that they may be rendered adequate custodians for their children, we think the statute must be viewed as creating rights and interests in the parents. These parents' desire to claim the benefits to which this statute entitles them in order to keep their families together is wholly consistent with the purposes of this legislation. Hence, the first and also the third prong of the *Cort* test are satisfied here.

The second *Cort* factor, the intent of Congress, has been identified by the Supreme Court as the most crucial factor in this analysis. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). Here, as in the analysis under *Maine v. Thiboutot,* above, the question is whether Congress intended to create a right which may be privately enforced. *Polchowski v. Gorris,* 714 F.2d 749, 751 (7th Cir.1983). For reasons stated above, the court concludes that the mandatory language of the AAA indicates Congress' intent to create enforceable rights, and the AAA's lack of a comprehensive remedial scheme supports the inference that Congress intended these provisions of the AAA to be privately enforced.

The final factor identified by the court in *Cort* is whether an implied federal private right of action would displace or intrude upon traditional state causes of action. Were this court to attempt to decide whether plaintiffs' children should be returned to them, this factor might militate against implication of a private right of action. But this court sees its role as very different from that. What this court believes this lawsuit requires it to do is to construe the proper reach of the AAA, determining what its provisions require participating states to do. This is a task well within the province of the federal courts and one that threatens no interference with the state courts' traditional role in determining issues of child custody.

Accordingly, the court concludes that it is appropriate to imply a private right of action under the AAA to enforce those of its provisions which create enforceable rights.

*Preliminary Injunction Analysis*

A likelihood of success on the merits has been shown with respect to Wanda Hilliard and Joann Mitchell but not with respect to Gina Johnson. Hilliard and Mitchell will be irreparably injured if DCFS does not do what the law requires it to do; they and their children are likely to sustain deep psychological injury and to have their relationships as families irreparably destroyed. There is no countervailing harm to the defendant; the cost of working out a viable service plan for these families is *de minimis.* Moreover, the defendant will save money if, by giving these plaintiffs modest assistance, it can get their children out of the foster care system. The public interest in this case is clearly expressed in the AAA: unnecessary foster care placement is detrimental to the individuals involved and to the public.

Accordingly, it is recommended that a preliminary injunction be denied in the case of Gina Johnson and granted in the case of Wanda Hilliard and Joann Mitchell. Defendant should be ordered to assign a caseworker who is familiar with the requirements of the AAA to meet with the Hilliard and Mitchell families and their counsel within 21 days to create a realistic case plan that will permit the obstacles to family reunification to be overcome promptly, if at all possible. The case plan should, among other things: (1) identify any obstacles to family reunification; (2) identify what if any resources are available to overcome any such obstacles; and (3) indicate how long overcoming such obstacles can be expected to take. The court should monitor the case plan and its follow-up.[9]

9. This recommended relief is prospective in nature and may not ultimately require the expend-

Counsel are given ten days from the date hereof to file exceptions to this Report and Recommendation with the Honorable William T. Hart. Failure to object constitutes a waiver of the right to appeal.

Respectfully submitted,

(s) Joan B. Gottschall

JOAN B. GOTTSCHALL

United States Magistrate

DATED: January 16, 1990.

iture of any state funds. Relief of this kind is not prohibited by the Eleventh Amendment.

*See Artist M., supra,* at 698–99.