James NORMAN, et al., Plaintiffs,

v.

Jess McDONALD, Director, Illinois Department of Children and Family Services, Defendant.

No. 89 C 1624.

United States District Court,
N.D. Illinois,
Eastern Division.

April 11, 1996.

---

**1220**

Laurene Marie Heybach, Susan Gail Wishnick, Legal Assistance Foundation of Chicago, Chicago, IL, Joan Matlack, Putterman & Howard, Chicago, IL, Diane L. Redleaf, Lehrer & Redleaf, Chicago, IL, for plaintiffs.

Christina M. Tchen, Susan Getzendanner, Charles F. Smith, Jr., Kimberley K. Baer, Nancy S. Eisenhauer, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, Bart T. Murphy, Gardner, Carton & Douglas, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

HART, District Judge.

This is a class action that challenged certain practices of the Illinois Department of Children and Family Services ("DCFS")[1] as being in violation of relevant federal statutes and the federal Constitution. Plaintiffs are impoverished parents or legal guardians who are or were at risk of losing their children because they were unable to provide adequate food or shelter for the children.[2] Plaintiffs alleged that DCFS had policies and practices of failing to assist plaintiffs in securing the resources and services necessary to keep their families intact that were in

---

1. Jess McDonald, the present Director of DCFS, is substituted for Sue Suter as the defendant in this case. See Fed.R.Civ.P. 25(d)(1).

2. The class that was certified is defined as follows:

All parents and guardians on or after the date of entry of this Consent Order: (a) whose children are in the temporary custody or under the legal guardianship of DCFS and upon whom, during such custody or guardianship, DCFS has imposed, in a service plan or otherwise, a condition that such parents obtain for themselves or their children such shelter, utili-

ty services, food, clothing, or income as DCFS deems necessary or appropriate for the return of their children; or (b) for whom there is an "indicated report" or pending report pursuant to [325 ILCS 5], that is or should have been designated as an allegation of "inadequate shelter," "inadequate food," "inadequate clothing," "environmental neglect," or any successor allegations that cover these categories of reports, and DCFS has taken or could take protective custody of the children pursuant to [325 ILCS 5/5], because of that allegation.

March 28, 1991 Consent Order ¶ 3(b).

violation of federal statutory and constitutional requirements.

In May 1990, this court granted preliminary injunctive relief to two of the named plaintiffs in this case. *See Norman v. Johnson*, 739 F.Supp. 1182 (N.D.Ill.1990). Defendant appealed that ruling. Prior to this court resolving the case on its merits or the Seventh Circuit resolving the appeal of the grant of preliminary relief, the parties settled the case. Following notice to the class and a hearing, the parties' proposed consent order was signed on March 28, 1991 (hereinafter the "Consent Order"). The Consent Order required that DCFS implement and develop certain procedures and provide certain services. The Consent Order also contains a requirement that defendant provide certain information and that a monitor (hereinafter the "Monitor") be appointed to receive the reports and make recommendations concerning the implementation of the Consent Order. The term of the Monitor's appointment was to be for approximately four years, expiring July 1, 1995. In February 1995, the parties agreed to move the court to extend that term to February 15, 1997. The basis of this motion was unresolved disputes regarding defendant's compliance with the Consent Order. An extension was granted, but only to February 15, 1996.

On February 12, 1996, plaintiffs moved to extend the monitoring period to February 15, 1998 on the ground that defendant had not complied with certain provisions of the Consent Order.[3] This time defendant opposes the extension. Defendant contends that he has substantially complied with the requirements of the Consent Order and that the additional expense of gathering information and employing the Monitor are no longer necessary. He also contends that changes in the law since March 1991 preclude the Consent Order from being enforced further. For purposes of resolving plaintiffs' pending motion, defendant concedes that the Sixth Monitoring Report dated May 24, 1995 and covering calendar year 1994 (the "Sixth Report") accurately reports defendant's compliance.

Under the terms of the Consent Order, defendant agreed to implement three general policies. (1) A child is not to be separated from a parent[4] because of living conditions or lack of subsistence unless there is reason to believe that the circumstances or conditions of the child present an "imminent danger" to the child's life or health and defendant has made "reasonable efforts" to prevent or eliminate the need for removal, unless reasonable efforts would not eliminate the need for removal. " 'Reasonable efforts' includes, for example, provision of hard services such as assistance in locating and securing housing, temporary shelter, cash assistance (directly paid by defendant or otherwise provided), in-kind services including food or clothing, child care, emergency caretakers, or advocacy with public and community agencies providing such services." Consent Order ¶ 4(a). (2) A child shall not be separated from a parent living in a shelter or substandard housing, unless there is reason to believe that the conditions present an "imminent danger" to the child's life or health. Before returning a child to such conditions, defendant shall determine the child will be allowed to reside there and have a bed. *Id.* ¶ 4(b). (3) Instead of removing a child from a parent because of failure to protect the child from a perpetrator of domestic violence, defendant shall make "reasonable efforts" to keep the child in the parent's custody unless an imminent danger to the child's life or health is presented or reasonable efforts would be to no avail. "In this context, 'reasonable efforts' includes not only the efforts listed in paragraph 4(a) of this order, but also, for example, referring the parent for services to obtain an order of protection, exploring possible alternative housing with, e.g., relatives, and locating and transporting the family to a shelter for battered women." *Id.* ¶ 4(c).

The Consent Order also contains more specific provisions. By July 1, 1991, defendant was to establish a cash assistance program providing a family with up to $800 per calendar year for rent, security deposits, util-

---

**3.** Alternatively, plaintiffs seek declaratory and injunctive relief regarding the alleged noncompliance.

**4.** As defined in the Consent Order, parent also includes a legal guardian, but not a foster parent.

ity fees, furniture, or other items if the assistance would prevent the separation of parent and child. Certain record keeping is also required. Records of the money disbursed and whether the recipients remained united or were reunited are to be kept. *Id.* ¶ 5.

By July 1, 1991, DCFS was to seek to enter into an agreement with the Department of Public Aid ("DPA") and jointly seek federal approval to continue AFDC benefits for up to 90 days during periods of DCFS temporary custody not expected to exceed 90 days. The agreement is also to provide that a parent can apply to DPA for benefits while a child is in DCFS custody and obtain payments prior to return of the child that will aid the parent in regaining custody. *Id.* ¶ 6.

By October 1, 1991, DCFS was to establish a housing advocacy program to provide certain housing services that would aid class members in finding suitable housing. DCFS was also to seek agreements with public housing authorities that would aid class members in finding housing. *Id.* ¶ 7.

By July 1, 1991, DCFS was to establish a referral service for each office consisting of a localized manual containing an annually updated list of community resources relevant to the needs of the class. DCFS employees are to receive annual instruction regarding use of the manual. *Id.* ¶ 8.

It was also agreed that DCFS would implement the following procedures by July 1, 1991: (a) require pertinent personnel to follow the requirements of the Consent Order and ensure timely administrative case reviews; (b) develop with the Monitor a means of documenting specific information regarding imminent danger determinations and the implementation of reasonable efforts; (c) "establish reasonable time guidelines within which DCFS workers should ordinarily return children home or initiate court action to do so for use in cases where problems with living circumstances are preventing family reunification;" (d) establish risk assessment methods based on living conditions; (e) establish a protocol for locating absent parents; and (f) promptly initiate court actions for the return of children. *Id.* ¶ 9.

The Consent Order contains a provision for notifying class members of their rights under the Consent Order and a method for appealing certain determinations. This was to be implemented by July 1, 1991. ¶ 10.

"Defendants shall provide to plaintiffs' counsel drafts of all new policies, procedures, programs, rules, regulations and notices for implementation of the provisions of this Consent Order at least thirty days prior to the relevant effective date specified in this Consent Order. Plaintiffs' counsel shall inform defendant's counsel of any objections they have to any such drafts because of plaintiffs' contention that said draft may violate the terms of this Consent Order, and the parties shall negotiate in good faith regarding any such objections." *Id.* ¶ 11.

The Consent Order contains provisions regarding training of DCFS personnel and provides plaintiffs' counsel with the opportunity to monitor that training until July 1, 1995. Initial training was to be completed by December 1, 1991. *Id.* ¶ 12.

The Consent Order also contains specific provisions regarding reporting and monitoring. The parties jointly nominated a monitor who was approved by the court. The Monitor was to produce semi-annual reports beginning January 1, 1992 and concluding July 1, 1995. The Monitor and the parties were to jointly develop the procedures for gathering "reliable and valid information necessary to measure compliance with the terms of the Consent Order," including: (a) whether defendant is properly determining what persons are class members; (b) whether timely and sufficient cash assistance was provided; (c) whether defendant is making reasonable efforts to unify families; (d) implementation of the time guidelines; (e) the adequacy of training; (f) whether the provisions of this order are properly applied during administrative case reviews; (g) whether class members are afforded full notice and appeal rights; (h) whether DCFS is making good faith efforts to seek interagency agreements; (i) whether DCFS is maximizing DPA payments; (j) the adequacy of risk assessment practices; and (k) whether determinations that a child cannot be returned within 90 days are being made for administrative or fiscal convenience. The Monitor was to submit a report within 60 days after receiving the required semi-annual data from DCFS.

She was to report on compliance with the Consent Order and make recommendations regarding any noncompliance. Defendant was required to consider the recommendations and, with the Monitor's assistance, negotiate with plaintiffs' counsel a plan for compliance. *Id.* ¶¶ 14–16.

The Consent Order also contains the following two provisions:

20. This court retains jurisdiction over this case to enforce compliance with this order or the recommendations of the Monitor. Plaintiffs may file a motion with this court at any time to seek compliance with the provisions of this Order or the recommendations of the Monitor, provided that, to the extent such a motion is based upon a report or recommendation of the Monitor under Paragraph 16, no motion shall be filed until plaintiffs have made attempts to negotiate the development and implementation of a compliance plan with defendant, with the assistance of the Monitor as set forth under Paragraph 16.

21. Defendant may file a motion with this court at any time seeking modification of the terms of this Consent Order if factual or legal circumstances materially change, experience with the administration of the Consent Order shows the need for modification in order to more effectively accomplish the goals of this Consent Order, it is no longer equitable that the Consent Order should have prospective effect, or such modification is necessary due to the hardship caused defendant by the Consent Order because of new and unforeseen conditions. Any decision by the court allowing or denying such a modification shall be made by weighing the interests of the class members in the immediate and strict enforcement of the terms of the Consent Order against the interests and harm to defendant without the proposed modification, and against the public interest.

Plaintiffs point to five areas of noncompliance that they contend support extending the period of monitoring: (a) failure to provide timely, accurate, and complete information; (b) failure to certify many eligible families as eligible for Consent Order services; (c) failure to provide timely and sufficient cash assistance to families in Cook County; (d) failure to screen cases for Consent Order compliance prior to initiating juvenile court actions and failure to initiate prompt return home activity as required by ¶ 9(c) of the Consent Order; and (e) failure to adequately utilize public aid resources as required by ¶ 6(b) of the Consent Order. For purposes of evaluating these contentions, defendant does not dispute the findings contained in the Sixth Report.

Defendant raises questions as to the need for certification, which is not a specific requirement of the Consent Order. In the Sixth Report (at 27–28), the Monitor states:

Certification determines who is potentially eligible for services when the need is present to prevent placement and to enable swift reunification of children with their families when other safety issues are no longer present. The request to receive those services must be approved. The real issue is not certification, but approval. I recommend that re-consideration be given to the certification process.

A large data system developed to capture the information is questionable. It is bureaucratic; the certification process itself does not provide help to the family. Since the determination to access the services has administrative safeguards, it seems consideration not to certify has merits. The Department can place the emphasis upon the service delivery and the development of data collection to determine who receives the service, for what service goal (placement prevention or reunification) and for what purpose (food, clothing, shelter, etc.), issues which are the purpose of the *Norman* program.

Defendant also points to data that 76 to 83 per cent of eligible families are correctly certified and contends this is satisfactory.

As plaintiffs point out, accurately certifying approximately 80 per cent of eligible families is a less than satisfactory rate when certification is required in order to receive benefits under the Consent Order. While defendant argues here that the certification process is an unnecessary procedure, in his December 11, 1995 written response to the Sixth Report, he argued that it was a necessary procedure, though one that should be modified. Def.App., Exh. 3 at 11–12. DCFS

still needs to improve its procedures for ensuring that eligible families have *Norman* benefits available to them. Whether a certification process should continue, in its present or a modified form, or whether an alternative procedure should be developed, is an issue, the resolution of which, could be aided by the continued input of the Monitor and class counsel.

Regarding the cash assistance program, the Monitor found:

An effective, computerized cash assistance data system is critical to the ongoing operation of this program. With the Department decentralizing the approval process, this becomes even more important. During every reporting period, cash period, cash assistance agencies in Cook County and downstate have depleted their funds and could not supply needed checks to vendors for clients. This past year was no exception. This results in clients losing scarce housing due to the lack of timely submission of checks. It also has a negative impact on the direct service workers who become discouraged with utilizing this resource for their clients. Some staff have stated to the Monitors[5] that they do not use this resource because it is too time consuming. While this is a small number of staff, there should be no worker who takes this stance. The system developed by the Management Systems team has safeguards to ensure such situations do not occur.

Sixth Report 35.

The Monitor concluded that Cook County was out of compliance, but that Downstate was in compliance. *Id.* She recommended:

a. DCFS finalize an automated cash assistance data system. It should contain the number of families receiving cash assistance and the amount, indicate whether for the purpose of placement prevention or reunification, the amount spent for food, clothing, shelter, utilities, etc., and the amount remaining in individual agency accounts.

b. DCFS complete the internal audit and share the results with plaintiffs' attorneys and the Monitor.

*Id.*

Defendant contends that it has corrected cash shortfalls when they have occurred. As plaintiffs point out, however, the shortfalls continue to occur and, as found by the Monitor, this has a discouraging effect on the use of the cash assistance program, which is a central element of the Consent Order. Further efforts are necessary to ensure compliance, in Cook County, with the cash assistance program required by the Consent Order.

Defendant concedes that DCFS has yet to develop procedures that comply with the requirements of ¶ 9(f) of the Consent Order regarding initiating court procedures to return children to their homes. However, defendant contends that, as previously agreed with the Monitor and plaintiffs' counsel, defendant is still working on a plan, but he does not believe that monitoring is necessary to ensure completion of a successful plan. This is a question of appropriate relief; it is not denied that there is noncompliance.

Paragraph 6(b) of the Consent Order requires that DCFS take the steps necessary to maximize obtaining Public Aid payments for eligible families for financial assistance in reuniting families. Defendant contends DCFS has complied because it has established a relationship with DPA as required by ¶ 6(a) of the Consent Order. However, DCFS has not ensured that those procedures will be regularly used. As the Monitor points out, 75% of *Norman* children in Cook County potentially would benefit from these procedures, but during one reporting period 475 children were returned home with the procedure being fully invoked in only 19 of those cases and attempted in six others. The Monitor concluded: "There is clearly underutilization of this extremely needed resource." Sixth Report 46. Defendant is not in compliance with ¶ 6(b) of the Consent Order.

Plaintiffs also complain that defendant has not fully complied with data reporting re-

---

**5.** The Monitor has an assistant who is sometimes    also referred to as a monitor.

quirements of the decree. The Consent Order has a number of requirements, not all of which are readily quantifiable, or data readily gathered, for purposes of determining compliance. Plaintiffs do not point to any specific area where they believe there may be noncompliance, but complain there is no data to make an accurate assessment. Plaintiffs point to various subjects for which data is lacking, but an examination of the Sixth Report shows that the Monitor only recommended further data collection in one of those areas.[6] *See* Sixth Report 59 ("ACR needs to automate the summary of the number of parents who need to be located and if the locating absent parent protocol or delegate search was conducted.") There are other areas where the Monitor has indicated information was inadequate for her to reach conclusions, but she does not suggest that further data collection is necessary. The lack of certain data is not a sufficient problem to justify extending the Monitoring period.

Defendant contends he is in compliance in a number of other areas not discussed by plaintiffs. But even if defendant were out of compliance in only one area, pursuant to ¶ 20 of the Consent Order, plaintiffs could seek court enforcement as to that one issue. It must be considered whether the undisputed areas of noncompliance support extending the term of the Monitor or other appropriate relief. That defendant has complied in other areas, though, is a factor to consider in determining whether there is still a need for the Monitor.

Defendant contends there is no longer a need for a Monitor to follow DCFS's compliance with the Consent Order. Defendant complains that the cost of the Monitor could be better spent on providing direct services or funds to the clientele DCFS serves. The cost for the Monitor has averaged approximately $107,000 per year. While that is not a small sum and likely could be usefully used elsewhere as well, it may be appropriate to

compare it to a conservative estimate that the cash assistance program alone saved $11,093,894 for the state during a six-month period of 1994. *See* Sixth Report 2. While the Monitor alone did not produce that savings, it shows that her contributions to the effort may more than offset the costs of her services.

As is indicated by the six reports of the Monitor, her collection and reporting of information has been an important and useful aspect of the improvements that have resulted from implementation of the Consent Order. It must be recognized, however, that the Monitor's role involves more than just data collection. It is also her duty to make recommendations, many of which have been followed by DCFS and accepted by plaintiffs. It is further her role to help mediate disputes between the parties to the Consent Order.[7] Moreover, the Consent Order expressly provides that, upon motion of plaintiffs, this court may enforce compliance with recommendations of the Monitor. The Monitor in this case has served an important and crucial function in the implementation of the Consent Order that appears to have been more than worth its cost. Extending the term of the Monitor would be more than just extending an information gathering requirement.

Even absent the Consent Order, DCFS could decide it was beneficial to retain the Monitor as an outside consultant. Defendant, however, believes the Monitor is no longer a necessity for achieving full compliance. This view of defendant must be given serious consideration, especially in light of the Monitor's indication that defendant is committed to implementing the Consent Order. *See* Sixth Report 6 ("There is no question regarding the commitment of Director Jess McDonald and his staff to meet the requirements of this Decree at the administrative level."). Also, any extension must be considered in light of the limited areas of noncompliance that have been found.

---

6. The Monitor also made recommendations regarding data collection for the cash assistance program. As was previously discussed that is an area of noncompliance. Presently under consideration are other alleged data collection deficiencies.

7. This provision alone may have saved substantial litigation costs. Prior to the present dispute, there has been virtually no need for court proceedings related to implementation of the Consent Order. Even in the present dispute, the availability of the Monitor's independent report avoided the need for any evidentiary hearing and its attendant costs.

■ While defendant's opinion that there is no further need for monitoring is respected, it is found that further monitoring is likely to be beneficial in reaching compliance with the Consent Order. Areas of noncompliance exist in which the Monitor's input would be beneficial. Her continued involvement may also be helpful in avoiding any need to resolve the specifics of noncompliance through litigation, a more costly procedure and one that would not necessarily produce a better result. Additionally, the costs of the Monitor are not found to be a sufficient basis for discontinuing her involvement. While allowing government agencies to proceed independent of direct monitoring is a valid goal, it appears that, in the present situation, a relatively good working relationship has developed amongst the involved parties. An approximately one-year extension of the Monitoring period is appropriate enforcement relief, one far better than the court now attempting to directly implement specific compliance with remaining aspects of the decree.

The extension of the monitoring period, however, will not be a general one. At the time the prior extension expired, the Monitor was near completion of her Seventh Monitoring Report covering calendar year 1995. It was previously ordered that a report be issued covering this time period, but no date had been specified. The prior order extending the Monitor's term until February 15, 1996 did not specify whether she could issue the report after that date. In light of the reporting deadlines set forth in the Consent Order, it was implicit that the report could be issued after February 15, 1996.[8] In any event, it will now be expressly ordered that the Monitor shall issue the Seventh Monitoring Report no later than April 30, 1996.[9] The response and negotiation procedures contained in ¶ 16 of the Consent Order shall be followed in regard to that report.

The Eighth Monitoring Report shall cover the calendar year 1996. That report will basically be limited to the areas of noncompliance that have been shown. It will be limited to reporting on compliance with ¶¶ 5(a) (Cook County only), 5(b) (Cook County only), 6(b), and 9(c) of the Consent Order and DCFS's methods of determining *Norman* eligibility, whether through certification or otherwise. For calendar year 1996, defendant shall comply with the information reporting requirements of ¶¶ 15(a), (b) (Cook County only), (d), and (i). Defendant shall also comply with ¶¶ 11, 15(e) and 15(f) as they relate to ¶¶ 5(a), 5(b), 6(b), and 9(c). The term of the Monitor's appointment shall continue until the date beyond December 31, 1996 permitted for preparing the report and the reasonable time necessary to complete the additional procedures set forth in ¶ 16 of the Consent Order.

■ Still to be discussed are defendant's contentions that this court lacks authority to order any relief. First, defendant contends that enforcement is limited to situations of contempt. Paragraph 20 of the Consent Order, however, specifically retains jurisdiction to enforce compliance with the Consent Order. *McCall–Bey v. Franzen,* 777 F.2d 1178, 1188 (7th Cir.1985). It does not require a finding of contempt. But even if jurisdiction had not been expressly retained, this court has inherent power to enforce an injunction, which is the form of relief contained in the Consent Order. *See United States v. Fisher,* 864 F.2d 434, 436 (7th Cir.1988).

The relief that will be granted is enforcement of the decree, not modification. The Consent Decree has no time limit.[10] Absent a change of circumstances justifying modification, *see generally Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), defendant has a continuing obligation to comply with the terms of the Consent Order. Only monitoring had a time limit. Monitoring, however, was an

---

**8.** Under the terms of the Consent Order, the Monitor has 60 days after receiving information from defendant to issue the report. Thus, even if she received the calendar year 1995 data on January 1, 1996, her report was not due until after February 15.

**9.** It is the court's understanding that the report is near completion. However, if it cannot be com-

pleted by April 30, the Monitor should request that the parties bring a joint motion extending the deadline.

**10.** The present motion is unlike *South v. Rowe,* 759 F.2d 610 (7th Cir.1985), where an intervenor sought to extend the applicable time limit for the substantive requirements of the decree in that case.

integral aspect of achieving compliance. Since compliance has not been achieved, monitoring may be ordered as a means to achieve and enforce compliance. But even if continued monitoring would be considered a modification of the decree, modification would be supported by a change in circumstances. The Consent Order contemplated compliance with various requirements would be reached between July and December 1991. Since full compliance has yet to be achieved, that is a changed circumstance that justifies extending a means contemplated by the Consent Order for reaching compliance.

Defendant also contends that the Consent Order cannot be enforced because of a change in the law that has occurred since the order was first entered. One of plaintiffs' claims was that defendant was required to comply with the statutory requirement that "reasonable efforts ... be made (A) prior to placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home." 42 U.S.C. § 671(a)(15). In granting preliminary relief, this court held, as had a number of other courts, that the "reasonable efforts" standard was enforceable in a suit under 42 U.S.C. § 1983. *Norman,* 739 F.Supp. at 1185–87. Subsequent to entry of the Consent Order, however, the Supreme Court ruled to the contrary. *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Plaintiffs contend the Consent Order is still enforceable because they had a number of other still substantial claims in their complaint.

The parties agree that the applicable standard is whether there is a substantial federal claim. *Evans v. City of Chicago,* 10 F.3d 474, 479–80 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1831, 128 L.Ed.2d 460 (1994). *Evans* does not delineate what it means by "substantial." Plaintiffs argue it means nonfrivolous. *See Hagans v. Lavine,* 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974); 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3564 (2d ed.1984). The discussion of the claims in

*Evans,* however, indicates a standard somewhat higher than mere nonfrivolousness. It must be an issue over which there are "genuine uncertainties." *Evans,* 10 F.3d at 479. This court understands *Evans* as meaning the federal claim may not be one that clearly is without merit.

In the preliminary injunction ruling, this court held (adopting the magistrate's recommendation) that a number of provisions of the Adoption Assistance and Child Welfare Act of 1980 ("AAA") were enforceable, not just 42 U.S.C. § 671(a)(15). *See Norman,* 739 F.Supp. at 1185 n. 8; 1203–08 (citing 42 U.S.C. §§ 622, 627, 671(a)(4), 671(a)(16), 675(1)). Other courts have also held that provisions other than § 671(a)(15) are enforceable. *See L.J. v. Massinga,* 838 F.2d 118, 123 (4th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989) (§§ 627(a)(2)(B), 671(a)(9), (10), (16), 675); *Lynch v. Dukakis,* 719 F.2d 504, 510–11 (1st Cir.1983) (§§ 608, 671(a)(16), 675); *Jeanine B. v. Thompson,* 877 F.Supp. 1268, 1283–85 (E.D.Wis.1995) (§§ 671(a)(2), (3), (7), (10), (11), (13), 627(a)(2), 627(b)(3)); *LaShawn A. v. Dixon,* 762 F.Supp. 959, 988–89 (D.D.C. 1991), *aff'd on other grounds sub nom., La-Shawn A. v. Kelly,* 990 F.2d 1319 (D.C.Cir. 1993), *cert. denied,* 510 U.S. 1044, 114 S.Ct. 691, 126 L.Ed.2d 659 (1994) (§§ 627, 671(a)(10), 675). *See also Angela R. v. Clinton,* 999 F.2d 320, 323–24 (8th Cir.1993) (claims to enforce provisions of the AAA other than §§ 671(a)(9) & (15) are not frivolous). Plaintiffs' complaint included claims based on § 627(a)(2)(c), requiring participating states to have "a service program designed to help children, where appropriate, return to families from which they have been removed;" §§ 622(b)(2) and 671(a)(4), requiring participating states to coordinate child welfare programs with other programs that provide benefits and services to poor families; §§ 671(a)(16), 675(1), and 675(5)(c), requiring case plans for every child and the development of a case review system; and §§ 627(a)(2)(B) and 671(a)(12), providing for notice and hearing rights.[11]

■ Defendant contends the claims seeking enforcement of the additional provisions

---

11. Section 627 is being repealed effective April 1, 1996. *See* Pub.L. 103–432, Title II, §§ 202(c),

(e), 108 Stat. 4454 (1994). Effective the same date, provisions regarding returning children to

are insubstantial in light of *Artist M.*, because the additional provisions are, like the "reasonable efforts" standard in *Artist M.*, too vague to be enforced.[12] Again, the merits of a case are not to be fully reconsidered when deciding whether to enforce a consent decree, only whether the claims are now clearly without merit. Including the preliminary injunction ruling in the present case, at least five published cases decided before *Artist M.* held that some or all of the provisions presently under consideration were sufficiently clear to be enforced. Subsequently, two published cases have considered the enforceability of pertinent provisions of the AAA in light of the pertinent holding in *Artist M.* One holds the provisions can be enforced, *see Jeanine B., supra,* and the other holds it is not frivolous to contend the provisions are enforceable, *see Angela R., supra.* In light of the existing precedents, it cannot be held that plaintiffs' claims are clearly without merit.

It also must be kept in mind that this court is only granting enforcement of parts of the Consent Order. The relief that will be granted does not include the enforcement of any of the "reasonable efforts" provisions of the Consent Order.[13] None of the provisions of the Consent Order that are being enforced are ones that could only have been obtained based on a compromise of the § 671(a)(15) claim. The enforcement that is being granted is based on still viable claims. Therefore, this court has authority to grant the relief.

IT IS THEREFORE ORDERED that:

(1) Jess McDonald is substituted for Sue Suter as the defendant in this case.

(2) Plaintiffs' motion for continued monitoring [209–1] is granted in part and denied in part. Plaintiffs' motion for declaratory and injunctive relief redressing substantial noncompliance with the consent decree and the court order of 03/10/95 [209–2] is denied without prejudice.

(3) The Monitor shall issue the Seventh Monitoring Report no later than April 30, 1996.

(4) An Eighth Monitoring Report shall be filed covering calendar year 1996, but shall be limited to reporting on compliance with ¶¶ 5(a) (Cook County), 5(b) (Cook County), 6(b), and 9(c) of the Consent Order and DCFS's methods of determining *Norman* eligibility. For calendar year 1996, defendant shall comply with the information requirements of ¶¶ 15(a), (b) (Cook County), (d), and (i) of the Consent Order. Defendant shall also comply with ¶¶ 11, 15(e) and 15(f) of the Consent Order as they relate to ¶¶ 5(a), 5(b) (Cook County), 6(b), and 9(c). The term of the Monitor's appointment shall continue until the date beyond December 31, 1996 permitted for preparing the Eighth Monitoring Report and necessary to complete the additional procedures set forth in ¶ 16 of the Consent Order.

---

their families are being added at 42 U.S.C. § 622(b)(9). *See* Pub.L. 103–432, Title II, §§ 202(a), (e), 108 Stat. 4453, 4454 (1994).

**12.** *Artist M.* also relied in part on § 671 only being required to be included in a state plan. Subsequent legislation essentially overruled that aspect of *Artist M.* except as to § 671(a)(15). *See* 42 U.S.C. §§ 1320a–2, –10. Defendant concedes that such an argument as to the provisions under consideration would have no merit in light of the new legislation.

**13.** Since not at issue, it need not be considered whether use of that language in provisions of the Consent Order necessarily means those provisions are based solely on enforcement of § 671(a)(15). Issuance of the Seventh Report will involve reporting on certain reasonable efforts requirements. That, however, is merely a report of previously gathered information and does not directly involve enforcing the reasonable efforts requirement.